# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-CA-01484-SCT

*AUBREY MITCHELL, INDIVIDUALLY AND ON
BEHALF OF ALL THE HEIRS AT LAW AND
WRONGFUL DEATH BENEFICIARIES OF
DEVIN R. MITCHELL, DECEASED, AND
MYRTLE MITCHELL, INDIVIDUALLY AND AS
THE NATURAL MOTHER AND NEXT FRIEND
OF AUBREONNA D. MITCHELL, A MINOR*

*v.*

*RIDGEWOOD EAST APARTMENTS, LLC, UAH
PROPERTY MANAGEMENT, L.P. AND TAVARIS
FRANSHAY COLLINS*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/09/2015 |
| TRIAL JUDGE: | HON. JAMES T. KITCHENS, JR. |
| TRIAL COURT ATTORNEYS: | WILLIAM ROLAND |
| | WALTER WILLIAM DUKES |
| | ROBERT B. MARSHALL, JR. |
| | DAVID RANDALL WADE |
| | JEFFREY GRAY BAKER HOUSTON |
| COURT FROM WHICH APPEALED: | CLAY COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | DAVID RANDALL WADE |
| | DENNIS C. SWEET, III |
| | JEFFREY GRAY BAKER HOUSTON |
| ATTORNEYS FOR APPELLEES: | WALTER WILLIAM DUKES |
| | DRURY SUMNER HOLLAND |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED - 12/15/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE DICKINSON, P.J., KITCHENS AND KING, JJ.**

**KITCHENS, JUSTICE, FOR THE COURT:**

¶1.    In the early-morning hours of January 1, 2012, sixteen-year-old Devin Mitchell was shot to death outside the apartment of his cousin, Queenie Walker, at Ridgewood East Apartments in West Point, Mississippi. Mitchell's family sued Ridgewood East, alleging, *inter alia*, premises liability. The Circuit Court of Clay County granted summary judgment to Ridgewood East. Finding that no genuine issue of material fact exists with regard to whether Mitchell's murder was foreseeable to Ridgewood East Apartments, we affirm the judgment of the Circuit Court of Clay County.

## FACTS AND PROCEDURAL HISTORY

¶2.    On December 31, 2011, Queenie Walker, a tenant of Ridgewood East Apartments since 2003, invited her cousins, Devin Mitchell, then sixteen years of age, and Aubreonna Mitchell, then fourteen years of age, to spend the night at her apartment. At midnight, Devin, Aubreonna, and Walker's three daughters went outdoors to celebrate the new year. Around 1:00 a.m. or 1:30 a.m., Devin visited with Porsha Ewing, who also resided at Ridgewood East, outside the window of her nearby apartment, for about an hour. The girls returned into Walker's apartment, but Devin remained outside. Because it was late, Walker called for Devin to return inside also. Devin replied, "I'm coming . . . ."

¶3.    As Devin was returning, three, four, or five shots rang out from above Walker's apartment. Walker realized that Devin had been shot when she saw him on the ground "not moving" just fifteen feet from the door to her apartment. Walker's daughter dialed 911 on a cellular telephone, because Walker "was shaking so bad." According to the incident report

2

prepared by police, the call was received at 2:55 a.m. on January 1, 2012. Walker went out to Devin and assured him that help was on the way.

¶4.     At her deposition, Walker testified that "the guy" came down the stairs and that she asked him what he had done and "started screaming at him" and "cursing at him." Walker stated that "the guy" was Tavaris Collins, that he was "[r]unning around after the shooting," and that his eyes were dilated and "he looked spaced out" and appeared to be "on something." According to Walker, Collins had put away the gun he had used in the shooting and was wielding a different Tech-9 handgun, which he set on the ground "as if he was trying to show me . . . that he didn't do it." Collins was arrested when the police arrived, around 2:57 a.m.[1]

¶5.     Devin was taken by ambulance to the Clay County Hospital, from which he was transported by helicopter to a Tupelo hospital where he died of a bullet wound to the head.

¶6.     According to an affidavit of the Ridgewood East Apartments property manager, Felecia Finley,  Collins was not a resident of the complex. He was a visitor of Yashia Davis, who had been a resident of the apartment complex since 2010. Davis lived at Ridgewood East Apartments with her two children. Porsha Ewing testified at Collins's criminal trial that Collins had been staying at Ridgewood East with his girlfriend, Davis, for two years. Collins was the father of one of Davis's children and he would stay to babysit his child while Davis worked.

---

[1] In May 2015, Collins was convicted of first-degree murder and two counts of possession of a weapon by a convicted felon. ***Collins v. State***, 2016 WL 6477040, *1 (Miss. Ct. App. Nov. 1, 2016).

¶7. On September 7, 2012, Devin's parents, Aubrey Mitchell, individually and on behalf of the heirs at law and wrongful death beneficiaries of Devin Mitchell, and Myrtle Mitchell, individually and as the natural mother and next friend of Aubreonna Mitchell, a minor (collectively the Mitchells), filed their first amended complaint against Ridgewood East Apartments, Antelope Investment Properties,[2] which conducted its business as Ridgewood East Apartments, UAH Property Management, L.P., the management company which operated Ridgewood East Apartments, Collins, and nine Doe defendants, in the Circuit Court of Clay County (collectively Ridgewood East). The Mitchells alleged, *inter alia*, that Ridgewood East had actual or constructive knowledge of the prior violent criminal conduct of Collins and that an atmosphere of violence existed at Ridgewood East at the time of the shooting.

¶8. On March 18, 2014, Ridgewood East designated Bruce A. Jacobs, Ph.D., as an expert in criminology. The trial court denied Ridgewood East's first summary judgment motion, which had been filed on October 9, 2013. Ridgewood East filed its second motion for summary judgment on March 31, 2014, arguing that no genuine issue of material fact existed with respect to foreseeability. Attached to the motion was Jacobs's affidavit. Jacobs, who examined crime data from the West Point Police Department for the three-year period preceding the shooting, opined that no atmosphere of violence existed at Ridgewood East.[3]

---

[2] Antelope was dismissed as a party by agreed order on April 16, 2014.

[3] Dr. Jacobs stated that the data he reviewed revealed the following:

- Not a single homicide occurred at the property in that three-year period.
- Not a single robbery (armed or strong arm) occurred at the property in

4

Having reviewed the police report of the incident, area crime data, and the deposition testimony of the witnesses, he concluded that no evidence existed that tended to put Ridgewood East on notice that Collins posed a threat to residents.

¶9.    The Mitchells responded on July 11, 2014, and sought further discovery. Attached to the response were various West Point Police Department incident reports from 2009 to 2013 involving Ridgewood East. On February 27, 2015, the Mitchells designated John A. Harris, B.S., M.S., as an expert in the field of premises liability and security. Harris stated in his affidavit, which was filed on March 29, 2015, that, in his professional opinion and within a reasonable degree of certainty, the shooting was foreseeable because it was reasonably foreseeable that: (1) residents and guests of the apartment would celebrate New Year's Eve, (2) on New Year's Eve, residents and guests "may engage in the use of drugs or alcohol," (3) residents and guests might violate the 10:00 p.m. curfew on New Year's Eve, (4) residents and guests would violate the apartment handbook rule against public drunkenness, (5) residents and guests might violate the apartment handbook "rule against weapons on the property in the absence of management or security officers on the property at the time" to ensure the rule's enforcement, (6) a resident or guest could be injured if the apartment's rules

---

that three-year period.
- Not a single rape or sexual assault occurred at the property in that three-year period.
- Not a single nondomestic aggravated assault occurred at the property in that three-year period.
- Not a single gun crime of any kind occurred at the property in that three-year period.
- Not a single person was seriously injured in any act of predatory (stranger-on[-]stranger) violence during that three-year period.

and policies were not enforced; and that it was unreasonable "for a reasonably prudent apartment manager/operator to shift the entire burden of enforcing the complex's policies and rules to the residents or even to the guests at the complex," and that Ridgewood East's breach of the duty of care applicable to "reasonably prudent apartment owners, managers and operators" caused or contributed to the shooting.

¶10.    Ridgewood East's second motion for summary judgment was heard on May 15, 2015. The trial court entered its order granting summary judgment to Ridgewood East on June 16, 2015. It found that, while Collins had lived on, or visited daily, the property for approximately two years, the apartment possessed neither actual nor constructive knowledge of his presence, since he had not been added to Davis's lease and no complaints previously had been filed involving him. The trial court further found that the Mitchells had not rebutted the conclusions of Dr. Jacobs, and that Harris's affidavit did not address whether an atmosphere of violence existed at Ridgewood East or whether Ridgewood East was on notice of Collins's violent nature. The trial court determined that no genuine issue of material fact existed with regard to foreseeability.

¶11.    The Mitchells filed a motion for relief from summary judgment pursuant to Mississippi Rule of Civil Procedure 60(b) on June 26, 2015, which the trial court denied on September 1, 2016. Aggrieved, the Mitchells filed a notice of appeal on September 28, 2015.

¶12.    The Mitchells argue on appeal that Collins himself constitutes an unreasonably dangerous condition and that Ridgewood East had constructive knowledge both of his

6

presence at the complex and of his violent nature.[4] They further assert that Ridgewood East, by incorporating into the tenants' written lease contracts property rules and policies, assumed the duty to prevent rule and policy violations and thereby rendered third-party criminal acts foreseeable.

## STANDARD OF REVIEW

¶13.    We review a trial court's grant of summary judgment *de novo*. *Borries v. Grand Casino, Inc.*, 187 So. 3d 1042, 1045 (Miss. 2016) (citing *Davis v. Hoss*, 869 So. 2d 397, 401 (Miss. 2004)). "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Miss. R. Civ. P. 56(c). The movant bears "the burden of demonstrating that no genuine issue of fact exists," while the nonmovant "should be given the benefit of every reasonable doubt." *Borries*, 187 So. 3d at 1046 (citing *Tucker v. Hinds Cty.*, 558 So. 2d 869, 872 (Miss. 1990)). The evidence is to be viewed in the light most favorable to the nonmoving party. *Stribling Inv., LLC v. Mike Rozier Constr. Co., Inc.*, 189 So. 3d 1216, 1219 (Miss. 2016) (citing *Cade v. Beard*, 130 So. 3d 77, 81 (Miss. 2014)). "The party opposing the motion must be diligent and, by allegations or denials, must set forth specific facts showing that there are genuine issues for trial." *Porter v. Grand Casino of Miss., Inc.*, 181 So. 3d 980, 983 (Miss. 2016) (citing *Davis*, 869 So. 2d at 401).

---

[4]    The Mitchells do not raise the issue of atmosphere of violence on appeal, though it was in part a basis for the grant of summary judgment.  Generally, "a question not raised on appeal will not be considered by the court." *Whittington v. H.T. Cottam Co.*, 158 Miss. 847, 130 So. 745, 749 (1930).

ANALYSIS

1. **Whether Ridgewood East had constructive knowledge of Tavaris Collins's violent nature.**

¶14. The Mitchells argue that, because Ridgewood East is federally subsidized and subject to the regulations of the United States Department of Housing and Urban Development (HUD), which authorizes public housing projects to obtain criminal history records, Ridgewood East had constructive knowledge of Collins's violent nature.[5] Ridgewood East responds that the HUD regulations merely authorize criminal background checks but do not mandate them. According to Ridgewood East, even assuming a duty to conduct a background check existed, the Mitchells presented no evidence to support their claim that Ridgewood East knew of Collins's presence on the property and, therefore, had constructive knowledge of his violent tendencies.

---

[5] The trial judge, who had presided over Collins's criminal trial, found that "Collins did have a prior felony conviction for aggravated assault . . . ." At the summary judgment hearing, counsel for the Mitchells stated that "my information suggest[s] that [Collins] had an aggravated assault felony conviction since 1999." The trial court responded that Collins had been "convicted of an aggravated assault back in '98 or '99." The trial court continued that Collins "had a possession of cocaine conviction that resulted in the a[g] assault being revoked." The record does not inform us how the trial court knew of Collins's prior aggravated assault and possession-of-cocaine convictions. No evidence was adduced to support the trial court's finding. Ridgewood East property manager Felecia Finley submitted an affidavit in which she stated that she "had no knowledge of Mr. Collins' alleged criminal background . . . ." Ridgewood East's lawyer admitted, with no specificity, that had a background check been conducted, Ridgewood East "would have seen that he had a prior." And the West Point Police Department Incident Report indicates that Collins may have been a felon in possession of a firearm, but no specifics about any prior felony convictions exist in the record before this Court, nor were any specifics about prior offenses provided to the trial court.

¶15.    Plaintiffs must, in order to recover on a negligence claim, demonstrate "that the defendant breached a particular duty owed to the plaintiff, and that the breach of duty proximately caused damages." *Adams v. Hughes*, 191 So. 3d 1236, 1240 (Miss. 2016) (quoting *Kroger Co. v. Knox*, 98 So. 3d 441, 443 (Miss. 2012)). While "those in control of real property have a duty, if reasonably possible, to remedy most dangerous conditions on their property and to warn of those they cannot eliminate, that duty presupposes the defendant knew, or should know, of the dangerous condition." *Id.* This analysis applies to premises-liability cases involving thirty-party assaults: "[w]here the alleged dangerous condition is the threat of an assault, the requisite cause to anticipate the assault may arise from (1) actual or constructive knowledge of the assailant's violent nature, or (2) actual or constructive knowledge that an atmosphere of violence exists on the premises." *Id.*

¶16.    This Court has considered cases involving actual knowledge of the assailant's violent nature. In the case of *Galanis v. CMA Management Company*, 175 So. 3d 1213, 1214 (Miss. 2015), the mother of Andreas Galanis, who had been murdered by his roommate, Bobby Batiste, filed a premises-liability action against the owners and management of the apartment complex where the murder had occurred. The trial court granted summary judgment, having determined that the owners and management could not be held liable for failing to warn Galanis of Batiste's violent tendencies. *Id.* at 1214. This Court reversed the judgment and remanded the case because evidence in the record showed that Batiste had filed a "resident concern form" in which he complained about a prior roommate. *Id.* The letter indicated that Batiste could not "take it anymore" and that he did not "want to get violent." *Id.* at 1215.

Batiste continued that he hoped "this get[s] resolved soon because I really don't want to take matters in[to] my own hands." *Id.* The Court held that the apartment complex had actual knowledge of Batiste's violent tendencies. *Id.* at 1218.

¶17.   In another case, the assailant, who had days before shot and grazed the victim, returned to the apartment complex, where he shot and killed the victim. ***Thomas v. Columbia Group, LLC***, 969 So. 2d 849, 852 (Miss. 2007). The Court reversed and remanded the trial court's grant of summary judgment because the complex had knowledge of the assailant's violent nature:

> The apartment manager at Shady Lane knew about the first shooting at least two days after it happened. Even if she did not hear about the shooting until two days after it happened, it was still several days before the second shooting, resulting in Thomas's death, occurred. There is even testimony that the apartment manager "knew something like this was going to happen," and that she was going to do something about it.

*Id.* at 854-55. The Court held that, based in part on "the manager's statement that she was going to ban and evict [the assailant] as well as improve security," the record presented a genuine issue of material fact. *Id.* at 855.

¶18.   This Court has not considered, however, the issue of whether an attack is foreseeable based on the property owner's constructive knowledge of an assailant's violent nature. Constructive knowledge is defined as "'information or knowledge of a fact imputed by law to a person (although he may not actually have it), because he could have discovered the fact by proper diligence, and his situation was such as to cast upon him the duty of inquiring into it.'" ***Doe ex rel. Brown v. Pontotoc Cty. Sch. Dist.***, 957 So. 2d 410, 417 (Miss. Ct. App. 2007) (quoting *Black's Law Dictionary* 1062 (6th ed. 1990)).

¶19.    To show that Ridgewood East by proper diligence could have discovered Collins's

violent nature, the Mitchells cite federal HUD laws and regulations, which are reproduced,

in pertinent part, below:

> (c) Authority to deny admission to criminal offenders
>
> Except as provided in subsections (a) and (b) of this section and in addition to any other authority to screen applicants, in selecting among applicants for admission to the program or to federally assisted housing, if the public housing agency or owner of such housing (as applicable) determines that an applicant or any member of the applicant's household is or was, during a reasonable time preceding the date when the applicant household would otherwise be selected for admission, engaged in any drug-related or violent criminal activity or other criminal activity which would adversely affect the health, safety, or right to peaceful enjoyment of the premises by other residents, the owner, or public housing agency employees, the public housing agency or owner may--
>
> (1) deny such applicant admission to the program or to federally assisted housing . . . .

42 U.S.C. § 13661(c).

> § 5.855 When am I specifically authorized to prohibit admission of individuals who have engaged in criminal activity?
>
> (a) You may prohibit admission of a household to federally assisted housing under your standards if you determine that any household member is currently engaging in, or has engaged in during a reasonable time before the admission decision:
>
>> (1) Drug-related criminal activity;
>>
>> (2) Violent criminal activity;
>>
>> (3) Other criminal activity that would threaten the health, safety, or right to peaceful enjoyment of the premises by other residents; or
>>
>> (4) Other criminal activity that would threaten the health or safety of the [public housing agency] or owner or any employee,

11

> contractor, subcontractor or agent of the [public housing agency] or owner who is involved in the housing operations.

24 C.F.R. § 5.855(a).

> § 5.903 What special authority is there to obtain access to criminal records?
>
> (a) Authority. If you are a [public housing agency] that administers the Section 8 program and/or the public housing program, this section authorizes you to obtain criminal conviction records from a law enforcement agency, as defined in § 5.902. You may use the criminal conviction records that you obtain from a law enforcement agency under the authority of this section to screen applicants for admission to covered housing programs and for lease enforcement or eviction of families residing in public housing or receiving Section 8 project-based assistance.
>
> (b) Consent for release of criminal conviction records.
>
> > (1) In order to obtain access to records under this section, as a responsible entity you must require every applicant family to submit a consent form signed by each adult household member.
>
> . . . .

24 C.F.R. § 5.903(a), (b)(1).

¶20.    In support of their argument, the Mitchells attach Davis's lease agreement which required that she yearly recertify to Ridgewood East the "income and composition of [her] household . . . for the purpose of determining [her] rent and assistance payment." A 2010 request for transfer indicated that Davis had "[a]dded a second child to the household," and listed herself, Yashia Davis, and two minor children, Cedrickus Hodges and Yavarian Collins. The Mitchells also submitted to the trial court the transcript of Porsha Ewing's testimony from Collins's criminal trial. Ewing testified that Collins had been staying with his girlfriend at Ridgewood East for "[m]aybe about two years." According to the Mitchells, "[i]f

12

Yashia Davis had told [Ridgewood East] that [Collins] was a member of her household, [Ridgewood East] would have conducted a criminal background check on [Collins], which would have revealed [Collins's] prior felony convictions and his violent nature." The Mitchells also speculate that Collins would have been denied a lease tenancy if Ridgewood East had conducted a background check.

¶21.    To find that knowledge of Collins's criminal record was imputed to Ridgewood East, this Court first must determine that Ridgewood East had a duty to inquire into it. But the HUD regulations presented by the Mitchells are merely permissive: Ridgewood East was authorized, not required, to deny admission to criminal offenders if it:

> determine[d] that an applicant or any member of the applicant's household is or was, during a reasonable time preceding the date when the applicant household would otherwise be selected for admission, engaged in any drug-related or violent criminal activity or other criminal activity which would adversely affect the health, safety, or right to peaceful enjoyment of the premises by other residents . . . .

42 U.S.C. § 13661(c)(1); 24 C.F.R. 5.855(a) (1)-(4). Ridgewood East also was authorized to obtain access to criminal records; but, if it chose to do so, it was required to obtain a consent form from the applicant family, signed by each adult household member. 24 C.F.R. § 5.903(b)(1). *Cf.* 24 C.F.R. § 5.854 (requiring landlord to prohibit admission of applicant if applicant "has been evicted from federally assisted housing for drug-related criminal activity"); 24 C.F.R. § 5.856 (requiring landlord to establish standards prohibiting "admission to federally assisted housing if any member of the household is subject to a lifetime registration requirement under a State sex offender registration program"); 24 C.F.R. § 5.857 (requiring landlord to "establish standards that prohibit admission to federally assisted

13

housing" if the landlord has "reasonable cause to believe that a household member's abuse or pattern of abuse of alcohol interferes with the health, safety, or right to peaceful enjoyment of premises by other residents").

¶22.   Nothing in the record demonstrates that Ridgewood East at any point undertook to obtain the criminal records of its tenants and that, in the event a tenancy applicant had a criminal record, it had a policy of denying admission. Indeed, this Court recently rejected the argument that an apartment complex could assume a heightened duty of care by adopting a policy of conducting background checks of prospective tenants. *Compare* ***Galanis***, 175 So. 3d at 1221 (Kitchens, J., dissenting) ("A jury could find that Batiste's stealing Galanis's debit card was within the realm of foreseeable harm that was within the risk being taken by 21 Apartments allowing someone with a criminal history to live in its apartment complex. . . . After all, is not the purpose of having a policy to exclude residents with a criminal history to avoid the commission of crimes on the apartment complex's premises?"), *with* ***Galanis***, 175 So. 3d at 1218 ("21 Apartments—as premises owner—already owed Galanis—as an invitee—a duty of reasonable care. Certainly, the Galanises may argue to the jury that 21 Apartments breached its duty to warn of known dangers by failing to reveal the results of Batiste's background check when it matched Batiste and Galanis as potential roommates. But that is an issue of breach, not duty.")

¶23.   Even under the standard articulated in the ***Galanis*** dissent, the Mitchells' claims fail. Davis's (and Walker's) lease permitted Ridgewood East to terminate a tenant's lease in the following relevant circumstances:

14

. . .

(3) drug related criminal activity engaged in[,] on[,] or near the premises[] by any tenant, household member, or guest, and any such activity engaged in on the premises by any other person under the tenant's control;

(4) determination made by the Landlord that a household member is illegally using a drug;

(5) determination made by the Landlord that a pattern of illegal use of a drug interferes with the health, safety, or right to peaceful enjoyment of the premises by other residents;

(6) criminal activity by a tenant, any member of the tenant's household, a guest or another person under the tenant's control:

> (a) that threatens the health, safety, or right to peaceful enjoyment of the premises by other residents (including property management staff residing on the premises);
>
> (b) or that threatens the health, safety, or right to peaceful enjoyment of their residences by persons residing in the immediate vicinity of the premises;

. . .

(10) if the Landlord determines that the tenant, any member of the tenant's household, a guest or another person under the tenant's control has engaged in the criminal activity, regardless of whether the tenant, any member of the tenant's household, a guest or another person under the tenant's control has been arrested or convicted for such activity.

¶24. A 2011 lease addendum stated, in pertinent part, that:

1. The Resident [or] any member at the Resident's household, or a guest or other person under the Resident's control shall not engage in or facilitate criminal activity on or near the project including, but not limited to, violent criminal activity or drug-related criminal activity.

2. The Resident or any member of the Resident's household shall not permit the dwelling unit to be used for, or to facilitate, criminal activity, including, but not limited to, violent criminal activity or drug-related criminal activity.

15

3. "Violent criminal activity" means any felonious criminal activity that has as one of its elements the use, attempted use, or threatened use of physical force against the person or property of another.

. . .

5. One or more violations of section 1 or 2 of this lease Addendum constitutes a substantial violation of the Lease and material noncompliance with the Lease. Any such violation is grounds for termination of tenancy and eviction from the unit.

¶25. The lease agreement and addendum allowed for termination in the event a tenant, or a member of the tenant's household or a guest, engaged in a criminal activity. The lease agreement and addendum did not mandate a background check or indicate that the landlord would terminate the lease based on the results of a background check if one were to be conducted. Additionally, the Ridgewood East lease required its tenants yearly to recertify the composition of their respective households. A consent form was required to allow HUD to obtain records "verifying employment and income of individuals participating in specified programs and . . . to conduct analyses of the employment and income reporting of these individuals."

¶26. The Ridgewood East policies differ from those of the apartment complex discussed by the dissent in *Galanis*. In that case, 21 Apartments had required that tenants "agree[] to an investigation of [his or her] 'credit, character, and reputation,' including a criminal background check." *Galanis*, 175 So. 3d at 1221 (Kitchens, J., dissenting). There, the apartment complex employed a "'zero tolerance' policy for criminal history," meaning that persons having a criminal history would be denied admission. *Id.* No evidence in the record demonstrates that such policies existed at Ridgewood East.

16

¶27. It cannot be said that Ridgewood East was on constructive notice of Collins's presence at the apartment complex because Ridgewood East had no duty—either at law or assumed based on its policies—to conduct a criminal history background check on it's tenants, let alone a guest of a tenant.

¶28. The Mitchells next analogize this case to a slip-and-fall claim in which the constructive knowledge of a dangerous condition is imputed to the property owner based upon the length of time the dangerous condition existed. "If the dangerous condition was created by someone not associated with the operation of the store, the plaintiff must produce evidence demonstrating that the operator had actual or constructive knowledge of the condition." **Drennan v. Kroger Co.**, 672 So. 2d 1168, 1170 (Miss. 1996) (citing **Downs v. Choo**, 656 So. 2d 84, 86 (Miss. 1995)). "Constructive knowledge is present where, based on the length of time that the condition existed, the operator exercising reasonable care should have known of its presence." **Drennan**, 672 So. 2d at 1170 (citing **Waller v. Dixieland Food Stores, Inc.**, 492 So. 2d 283, 285 (Miss. 1986)). The Mitchells argue that, in this case, Ridgewood East "had **two years** to discover [that Collins] was living at Ridgewood East Apartments and to require his consent to a criminal background check if he wanted to remain a member of Yashia Davis's household at Ridgewood East Apartments." (Emphasis in original.)

¶29. In **Drennan**, 672 So. 2d at 1168, a woman slipped and fell at a Kroger grocery store. This Court reversed the trial court's grant of a directed verdict to Kroger because "Drennan produced evidence demonstrating that Kroger should have been aware from past conditions,

17

occurrences, and stains on the ceiling that the area above aisle four leaked in periods of heavy rain" and that such "circumstances created an inference that the Kroger store should have been aware of the leaks in the roof." *Id.* at 1172. *Cf.* **Jones v. Imperial Palace of Miss., Inc.** 147 So. 3d 318, 321 (Miss. 2014) ("[I]n the case before us today, the plaintiff produced no evidence that Imperial knew or had reason to know that the particular bumper that caused Jones's injury was misaligned at the time of the injury"). Here, the Mitchells have put forth no evidence to show that Ridgewood East should have known of the violent tendencies of Collins. No evidence in the record demonstrates that Ridgewood East ever, in the two years Collins was alleged to have been living there, experienced a problem with Collins or learned of a complaint against him that should have put it on notice of his violent tendencies. Moreover, apart from a brief discussion by the trial court and counsel at the summary judgment hearing,[6] no evidence in the record before this Court supports that Collins's criminal history included a violent crime.

¶30. Finally, the Mitchells argue that the policies of Ridgewood East allowed it "reasonably [to] enter the apartment units in order to enforce the rule against authorized [sic] persons living on the property." The Ridgewood East Resident Handbook required that "[g]uests staying longer than two nights at a time or more than two nights per week must be registered at the rental office. NO guests may stay on a permanent basis. Failure to adhere to this policy is a violation of your lease agreement." And it is true that the lease agreement provided that the landlord was permitted to "enter the unit for the purpose of making

---

[6] *See supra* fn. 6.

reasonable repairs, conducting periodic inspections, and providing extermination services." The Resident Handbook allowed for periodic inspections of the unit, but the purpose of the periodic inspections was to ensure that "good housekeeping practices are being followed by the residents," that the "apartment is being properly maintained by the maintenance staff," and that "possible structure and other damages are repaired as required." The policy of periodic inspections did not exist for the purpose of enforcing Ridgewood East's guest policy.

¶31. Because Ridgewood East did not have constructive knowledge of Collins's violent nature, this issue is without merit.

2. **Whether Ridgewood East's property rules and policies rendered third-party criminal acts foreseeable by imposing a duty on Ridgewood East to prevent rule and policy violations.**

¶32. The Mitchells argue that the two-prong test by which foreseeability in premises liability cases involving third-party assaults may be proved is not the "<u>exclusive</u> method of proving foreseeability . . . ." (Emphasis in original.) They continue that "where a defendant has assumed duties defined by the words and terms of a written contract, evidence of those contractual duties can be sufficient evidence to prove 'foreseeability' in premises liability cases involving third-party criminal assaults . . . ." According to the Mitchells, Ridgewood East's rules and policies prohibited weapons, alcohol, illicit drugs, public drunkenness, fighting, or verbal altercations and, therefore Ridgewood East "clearly breached [its] duty to enforce the rules."

19

¶33. But this Court soundly has rejected the argument that a heightened duty of care can be assumed in the context of a premises-liability claim. *Galanis*, 175 So. 3d at 1218. This Court cited *Doe ex rel. Doe v. Wright Security Services, Inc.*, 950 So. 2d 1076, 1078 (Miss. Ct. App. 2007), in which the Jackson Public School District (JPSD) had contracted with Wright Security Services (Wright) to provide security for students at a bus stop. A student was sexually assaulted by another student after having been permitted by a Wright security guard to go unescorted to a nearby restaurant's restroom. *Id.* The student sued Wright, arguing that, through its contract with JPS, it had assumed a duty to protect the children at the bus stop. *Id.* The Mississippi Court of Appeals agreed and reversed and remanded the trial court's grant of summary judgment to Wright, finding that a genuine issue of material fact existed regarding whether the injuries were foreseeable. *Id.* at 1086. More specifically, the court held that "this is not a premises liability case," and that the duty of care "resulted from Wright's contract with JPSD to provide security services at the bus stop for the students . . . ." *Id.* at 1081.

¶34. In *Galanis*, this Court found *Doe* to be distinguishable, because Galanis was a premises-liability case: "*Doe* stands for the proposition that one may assume a duty of reasonable care where one previously did not exist," but "the contract in *Doe* created Wright's duty of reasonable care, whereas 21 Apartments already owed a duty of reasonable care to Galanis." *Galanis*, 175 So. 3d at 1217-18. The Court found that *Doe* could be applicable "if 21 Apartments had contracted with someone to provide security, and the Galanises had tried to sue that party," but that such was not the case: "21 Apartments did not

contract with anyone to protect its tenants, and no one contracted with 21 Apartments to protect its tenants." *Id.* at 1218.

¶35.    Similarly, here, Ridgewood East owed only a duty of reasonable care to prevent foreseeable harm to Devin Mitchell. And while the Guest Policy in the Resident Handbook, which was incorporated by reference into the lease agreement, prohibited alcoholic beverages, loitering in the parking lot, public drunkenness, fighting, disturbances, verbal altercations, threats, or weapons on the grounds[7] and the lease contract permitted Ridgewood East to terminate the lease if a tenant or guest used an illicit drug or engaged in "drug related activity," it cannot be said that by incorporating policies and rules into the lease agreement, Ridgewood East assumed a contractual duty to tenants and guests to prevent any and all violations of the rules, even those of which it had no actual or constructive knowledge.

¶36.    No genuine issue of material fact exists with regard to foreseeability of a third-party criminal act based on the existence of Ridgewood East's policies and rules. This issue is without merit.

---

[7]No evidence in the record supports the Mitchells' assertion that:

Defendants assumed other duties under the lease agreement as well, including but not limited to, a duty to (1) reasonably stop and question guests on the property; (2) to reasonably require guests to provide identification; (3) to reasonably enter apartment units to determine whether unauthorized persons were living in the unit . . . .

21

## CONCLUSION

¶37.    Because no genuine issue of material fact exists in the record before this Court on the question of the foreseeability of the tragic shooting death of Devin Mitchell, we affirm the Circuit Court of Clay County's grant of summary judgment to Ridgewood East.

¶38.    **AFFIRMED.**

**WALLER, C.J., DICKINSON, P.J., KING, COLEMAN, MAXWELL AND BEAM, JJ., CONCUR. RANDOLPH, P.J., AND LAMAR, J., NOT PARTICIPATING.**