# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-CA-00956-SCT

*THE DOOR SHOP, INC.*

*v.*

*ALCORN COUNTY ELECTRIC POWER ASSOCIATION*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/08/2017 |
| TRIAL JUDGE: | HON. JAMES LAMAR ROBERTS, JR. |
| TRIAL COURT ATTORNEYS: | DAVID L. SANDERS |
| | NICHOLAS RYAN BAIN |
| | WILLIAM HULL DAVIS, JR. |
| COURT FROM WHICH APPEALED: | ALCORN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | NICHOLAS RYAN BAIN |
| ATTORNEY FOR APPELLEE: | WILLIAM HULL DAVIS, JR. |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 11/08/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**ISHEE, JUSTICE, FOR THE COURT:**

¶1.     From November 2004 to January 2011, The Door Shop, Inc., utilized $36,081.86 of electricity from Alcorn County Electric Power Association (ACE).  But because of a billing error, it was charged only $10,396.28.  Upon discovering the error, ACE sought to recover the $25,658.58 difference via supplemental billing.  The Door Shop refused to pay, which prompted ACE to file suit in the Alcorn County Circuit Court.  ACE maintained that The Door Shop was liable for the underbilled amount and moved for summary judgment, which the circuit court granted.  This appeal followed.  We affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.    ACE is the state-authorized entity charged with providing electric-power services to Alcorn County, Mississippi. It receives and distributes its electric power via a wholesale contract with the Tennessee Valley Authority (TVA). The Door Shop, an Alcorn County business, applied for new services from ACE in October 2004. By executing ACE's "Application for Service," The Door Shop bound itself to ACE's bylaws.

¶3.    ACE's Engineering and Operations Manager, Jason Grisham, explained ACE's procedures for establishing new accounts. First, ACE installs an electric meter, which must be linked to a current transformer. The transformer decreases the amount of current registered by the meter, as the actual current transferred through the electric cable is greater than the current rating of the meter. The result is that the meter measures only a fraction of the actual electricity used. Here, The Door Shop's meter operated on a 40:1 ratio—that is, for every 40 kilowatt hours of electricity used, The Door Shop's meter would register only 1 kilowatt hour of use. Therefore, The Door Shop's meter should have been corrected with a "multiplier" of 40.[1]

¶4.    Once the meter is installed and the multiplier is determined, ACE's billing department is made aware of the multiplier so that it may be applied to the customer's account. But The

---

[1] ACE provided this helpful example: "[I]f the Door Shop's meter reading one month was 10 kilowatt hours, the actual usage was in fact 400 kilowatt hours (10 kWh x 40 multiplier = 400 kWh). Therefore, the bill sent to the Door Shop for that month should be 400 kilowatt hours."

2

Door Shop's multiplier—though reported to ACE's billing department—was not applied, leaving in place the default multiplier of 1. ACE's mistake resulted in The Door Shop's being charged for only 1/40 of the electricity actually used. The error persisted from November 2004 until late January 2011. After discovering the error, ACE corrected the multiplier, adjusted its billing to reflect The Door Shop's actual amount of electricity used, and calculated the difference. ACE ultimately determined that The Door Shop had been underbilled by $25,685.58.

¶5. ACE then sent The Door Shop a supplemental bill for the underbilled amount. ACE did so under Article II, Section 12, of its bylaws, which outlines ACE's rights and procedures for collecting undercharged amounts due to billing errors. With The Door Shop unwilling to pay, ACE filed suit to collect the amount due.

¶6. The Door Shop filed a motion to stay the proceedings, arguing that the dispute pertained to ACE's quality of service. And as a service issue, The Door Shop asserted that the Mississippi Public Service Commission (MPSC), by statute,[2] possessed exclusive jurisdiction over the matter. But the circuit court rejected The Door Shop's characterization, instead finding that the claims regarded "rates," which encompassed amounts charged and efforts at collection. Holding further that the MPSC lacks jurisdiction over matters involving rates, the circuit court denied The Door Shop's petition to stay the proceedings. Because no dispute existed as to ACE's adjusted accounting or the actual amount of electricity used by

---

[2] *See* Miss. Code Ann. § 77-3-5 (Rev. 2018).

3

The Door Shop, ACE then moved for, and was granted, summary judgment. The Door Shop timely appealed.

## STANDARD OF REVIEW

¶7.    Decisions granting or denying motions to stay proceedings are reviewed for abuse of discretion. *Prescott v. Leaf River Forest Prods. Inc.*, 740 So. 2d 301, 307 (Miss. 1999). Jurisdiction, on the other hand, is a question of law, which we review de novo. *Pekin Ins. Co. v. Hinton*, 192 So. 3d 966, 970 (Miss. 2016). This Court likewise reviews a circuit court's grant of summary judgment de novo. *Daniels v. Crocker*, 235 So. 3d 1, 6 (Miss. 2017).

## DISCUSSION

¶8.    The pertinent issues on appeal are, first, whether the circuit court erred in denying The Door Shop's motion to stay the proceedings by holding that the MPSC lacked jurisdiction, and, second, whether the circuit court erred in granting ACE summary judgment. The classification of ACE's claim and its jurisdictional effect, however, are the principal issues to be resolved, as the former directly affects the latter. We hold that the circuit court correctly classified the dispute as one involving "rates," the ultimate jurisdictional issue. We likewise conclude that the circuit court correctly granted ACE summary judgment.

> **I.    Whether the circuit court erred in denying The Door Shop's motion to stay the proceedings by holding that the MPSC lacked jurisdiction.**

¶9.    "Subject matter jurisdiction is a threshold inquiry which must be determined before

4

a court may proceed to the merits." ***Schmidt v. Catholic Diocese of Biloxi***, 18 So. 3d 814, 821 (Miss. 2009). Much of The Door Shop's argument hinges on its belief that the MPSC—not the circuit court—possessed exclusive jurisdiction over the matter. To resolve this jurisdictional issue, we simply look to Mississippi Code Section 77-3-5—the statute outlining the MPSC's jurisdictional parameters. *See* Miss. Code Ann. § 77-3-5 (Rev. 2018).

¶10. On one hand, Section 77-3-5 vests the MPSC with "exclusive original jurisdiction over the intrastate business and property of public utilities." *Id*. On the other hand, however, Section 77-3-5 divests the MPSC of jurisdiction in certain realms, providing,

> [T]he [MPSC] *shall not* have jurisdiction over the governance, management or other internal affairs of entities as described by paragraphs (b) and (c) below. Moreover, [MPSC] *shall not* have jurisdiction to regulate the *rates for the sales and/or distribution*:
>
> . . . .
>
> (b) Of gas or *electricity by* cooperative gas or *electric power associations to the members thereof as consumers*, except as provided by Section 77-3-17, where service is rendered in a municipality[.]

*Id*. (emphasis added).[3] Thus, the MPSC lacks jurisdiction in all matters relating to the

---

[3] We note that Section 77-3-5 was amended effective July 1, 2018. *See* 2018 Miss. Laws ch. 402, §24. The amended language provides,

> [T]he [MPSC] shall have exclusive original jurisdiction over the intrastate business and property of public utilities *and, for purposes of clarification of the existing scope of said exclusive original jurisdiction, such exclusive original jurisdiction extends, but is not limited to: the establishment of retail rates; challenges, including customer complaints, to the amount of a retail rate or customer bill or whether such rate is just and reasonable; and*

governance, management, or internal affairs of entities like ACE, as well as to the "rates" for sale and distribution of electricity by the same. *See id*. And so, by concluding this case pertained to "rates," the circuit court held that Section 77-3-5 divested the MPSC of exclusive jurisdiction. For that reason, we must determine whether ACE's claims fall within the definition of the term "rate" as referenced in Section 77-3-5.

¶11. On this question, The Door Shop insists that the issues presented involve "quality of service" rather than "rates." ACE is responsible, The Door Shop argues, for installing a customer's electrical meter. And, after installation, ACE is responsible for applying a multiplier. Thus, failure to apply a correct multiplier results in improper installation. And because ACE failed to apply the multiplier here, it provided The Door Shop with defective service; and defective service pertains to quality of service—not rates. Like the circuit court, however, we find this argument lacks merit.

¶12. We begin with service quality. The Door Shop points to our Public Utilities Act,

---

*challenges to the validity or accuracy of rates charged by a public utility, or to the accuracy or reliability of information submitted to the [MPSC] by a public utility or other person in support of or in opposition to a proposed or approved rate, regardless of the legal theory upon which any such challenge is made*.

*Id*.

First, the amended language clarifies (rather than expands) the scope of the MPSC's exclusive jurisdiction; second, the amendment does not alter Section 77-3-5(b), which pertains to entities like ACE; and lastly, the amendment does not operate retroactively—therefore, its prospective effects have no bearing upon this case. *See id*.

where "service" is defined as "the sale or other disposition of energy at the lowest cost consistent with sound economy, public advantage[,] and *the prudent conduct of the business of the authority.*" Miss. Code Ann. § 77-5-3(*l*) (Rev. 2018) (emphasis added). To The Door Shop, ACE's failure to apply the correct multiplier means that ACE failed to act in a "prudent" manner. This all but concludes The Door Shop's argument as to service quality and prudence. So, keeping in mind that ACE instituted this suit to collect an underbilled amount, let us now turn to "rates."

¶13.    Mississippi Code Section 77-3-3(e) defines what constitutes a "rate," providing:

> The term "rate" means and includes *every compensation, charge*, fare, toll, customer deposit, rental and classification, *or the formula or method by which such may be determined*, or any of them, demanded, observed, *charged* or collected *by any public utility for any service, product or commodity* described in this section, offered by it to the public, *and any rules, regulations, practices or contracts relating to any such compensation, charge*, fare, toll, rental or classification[.]

Miss. Code Ann. § 77-3-3(e) (Rev. 2018) (emphasis added).[4]

---

[4] ACE further points out that Mississippi Code Section 77-5-203(n) defines "rate" even more broadly:

> "Rate" means and includes every compensation, charge, deposit, contribution, fee, fare, toll, rental, cost and classification, or the formula or method by which such may be determined, or any of them, demanded, observed, charged, collected, avoided, or owed by a corporation for or relating to electric energy offered or provided by the corporation to the public or received by the corporation, and any rules, regulations, practices or contracts relating to any such compensation, charge, deposit, contribution, fee, fare, toll, rental, cost, or classification, including, but not limited to, *any rules, regulations, practices or contracts relating to the disconnection of service to members or nonmember customers who have failed to pay for electric energy provided by*

7

¶14. Reviewing how broadly the term "rate" is defined, we conclude that this case falls within the purview of "rates." To that end, this Court has held that, when taken together, Sections 77-3-3(e) and 77-3-5 bar "the [M]PSC from regulating not only the amounts charged by nonprofit public utilities for their services, but also the formula used to calculate that amount and any rules or regulations related to this process." *Miss. Rural Water Ass'n. Inc. v. Miss. Pub. Serv. Comm'n*, 222 So. 3d 288, 293 (Miss. 2017).

¶15. Applied here, ACE argues, and we agree, that the substance of its claims invokes many of the terms listed in Section 77-3-3(e). For example, ACE sought "compensation" for a "charge" related to a "service, product, or commodity" it supplied The Door Shop. Going further, the error prompting this suit derived from ACE's failure to apply the correct multiplier to The Door Shop's account—and the multiplier pertains to "the formula or method by which [ACE's charges] may be determined." Lastly, ACE relied upon its "rules, regulations, practices, [and] contracts relating" to the sought-after "compensation" or "charge." Put simply, this case involves "rates," as defined under Section 77-3-3(e).

¶16. As a result, the circuit court properly characterized ACE's claims. And, by extension, the circuit court correctly concluded that Section 77-3-5 deprived the MPSC of jurisdiction. Therefore, the circuit court did not err in denying The Door Shop's motion to stay the proceedings. *Prescott*, 740 So. 2d at 307. We find this issue without merit.

---

*the corporation.*

Miss. Code Ann. § 77-5-203(n) (Rev. 2018).

## II. Whether the circuit court erred in granting ACE summary judgment.

¶17. As to summary judgment, our standard is well established. "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." M.R.C.P. 56(c). The evidence must be viewed in the light most favorable to the nonmoving party, which here is The Door Shop. *Mitchell v. Ridgewood E. Apartments LLC*, 205 So. 3d 1069, 1073 (Miss. 2016). Nonetheless, The Door Shop "must set forth specific facts showing that there are genuine issues for trial." *Id.* (citations omitted).

¶18. Because it found no genuine disputes as to any material facts, the circuit court granted ACE summary judgment. In so ruling, the circuit court held that ACE's bylaws contractually bound The Door Shop. Specifically, the circuit court found that Article II, Section 12, of ACE's bylaws required The Door Shop to remit payment. Disagreeing, The Door Shop argues that genuine questions remain as to whether ACE's bylaws actually entitle it to recover the underbilled amount. Ultimately, we find that the bylaws do entitle The Door Shop to such relief.

¶19. To begin, we recount the material facts not in dispute (i.e., facts The Door Shop admittedly has no evidence to contest): (1) that the electrical meter installed at The Door Shop in November 2004 was accurate; (2) that the correct multiplier that should have been applied was 40 rather than 1; (3) that 346,680 kilowatt hours were actually used between

9

November 2004 and January 2011; and (4) that ACE's adjusted accounting and supplemental bill of $25,685.58 was accurate. There being no dispute as to amounts consumed and owed, the central issue is whether ACE's bylaws entitle it to recovery.

¶20. The answer to this question begins with reviewing ACE's application-for-service form. When The Door Shop applied for service, it specifically and contractually agreed to the following:

> *I hereby apply for membership* in the Alcorn County Electric Power Association, *and agree*, if accepted as a member thereof, *to conform to the charter by-laws of [ACE]*, copies of which have been made available to me at the office of [ACE] . . . . The applicant *agrees that this application is subject to [ACE]'s rules and regulations*, . . . and that these rules and regulations are a part of this agreement.

(Emphasis added.) Charles Bain (a former co-owner of The Door Shop) admitted through deposition testimony that he both executed the application for service on The Door Shop's behalf and that he "agreed to abide by [ACE's by-laws.]" And Bryan Bain (The Door Shop's president) likewise admitted through deposition testimony that The Door Shop had agreed to ACE's bylaws. Therefore, there is no genuine dispute that The Door Shop is obligated to comply with ACE's bylaws.

¶21. The specific bylaw at issue, Article II, Section 12, provides,

> Section 12. Under Billing. In the event that a billing or other error by [ACE] results in a member being undercharged for the actual amount of electricity provided to the member by [ACE], *then upon discovery of the error, and regardless of the cause or duration of the error, [ACE] will issue a supplemental billing reflecti[ng] the corrected amount owed by the member; and the member shall remit payment to [ACE] for such supplemental billing.* [ACE] may make arrangements for the payment of such supplemental billing

10

> on an installment basis, subject to such terms and conditions as may be approved by [ACE]'s Board of Directors.

(Emphasis added.) A simple reading of this bylaw reveals that ACE's members "shall remit payment," "regardless of the cause or duration of [an] error" "upon discovery of the error[.]" Applied here, The Door Shop is obligated to remit payment—the error, however long in duration, was discovered by ACE and, pursuant to the bylaw, The Door Shop received a supplemental bill reflecting the corrected amount owed (which, again, is *not* in dispute). That, however, is not the end of it.

¶22.    Indeed, The Door Shop makes much ado over the fact that the bylaw above was not in force when it applied for service in 2004—rather, ACE adopted it in 2009. So it reasons that ACE did not authorize itself to collect undercharged amounts *before* 2009. But Article VII, Section 12, of ACE's 1997 bylaws, which were in effect when The Door Shop applied for service in 2004, provided,

> Section 12.  Purchase of Electric Energy.  Each member *shall*, as soon as electric energy is available, *purchase from [ACE] all electric energy used on the premises* described in the application for membership, and *shall pay promptly therefore monthly at such rates as may be fixed by the Board of Directors from time to time*.

(Emphasis added.) The crux of the 1997 provision is this: ACE's members must pay for (i.e., purchase) *all* electric energy *used* on the premises. Recalling that there is no dispute about the amount of electricity The Door Shop consumed, its contractual obligation to purchase from ACE "all" the electricity it admittedly "used" has existed since The Door Shop became a member.

11

¶23. Moreover, the circuit court correctly noted that Mississippi Code Section 77-5-223 empowers ACE's Board of Directors "[t]o adopt and amend by-laws for the management and regulation of the affairs of [ACE]." Miss. Code Ann. § 77-5-223(a) (Rev. 2018).[5] Outlining this right in its 1997 bylaws, Article X, Section 4, provided that ACE's Board of Directors was at liberty to alter, amend, repeal, or adopt new bylaws so long as certain voting standards were satisfied. That is precisely what ACE's Board did when it adopted the 2009 underbilling amendment specifically outlining its underbilling procedures. Thus, ACE's Board acted pursuant to lawful authority, and The Door Shop had notice of the Board's power to do so.[6] Any argument otherwise is without merit.

¶24. Even so, in a last-ditch effort to circumvent its contractual obligations, The Door Shop

---

[5] *See also* Miss Code. Ann. § 77-5-231(h), (k) (Rev. 2018) (describing ACE's specific powers as to the making and entering contracts, the terms and conditions related thereto, and the right to collect fees and other charges for services rendered).

[6] As to the retroactivity of an amended bylaw, our law lacks authority on point; therefore, we seek guidance from our sister states. To that end, we find helpful **Kelley v. Tracy Fire Department Relief Association**, 390 N.W.2d 394, 398 (Minn. Ct. App. 1986). In **Kelley**, the Minnesota Court of Appeals reiterated the rule that bylaws do not have exclusively prospective effect unless expressly limited to such—rather, *an amended bylaw may apply retroactively "so long as it does not materially impair existing contractual rights." Id.* at 398 (emphasis added).

Here, we have held that The Door Shop had a contractual obligation to pay for all the electricity it used since becoming a member of ACE in 2004. Moreover, ACE's bylaws must apply to *all* its members, regardless of a member's tenure. *See* Miss. Code Ann. § 77-5-225. We find **Kelley**'s rule persuasive, because ACE's 2009 bylaw amendment did not "materially impair" any existing contractual rights; instead, the amendment was procedural in nature, not substantive. Therefore, we find no genuine dispute as to this issue and reject The Door Shop's argument.

12

presents a two-pronged argument: first, that to hold it liable for the undercharged amount equates to "rate discrimination"; and second, that any underbilling should be capped at six years. We find no merit in either argument, as addressed below.

## A. Rate Discrimination

¶25. "Rate discrimination," which state and federal law prohibits, occurs when consumers of the same class (i.e., residential or commercial) are charged different rates or are provided with rebates or other concessions, directly or indirectly. *See generally* Miss. Code Ann. § 77-5-225 (Rev. 2018); 16 U.S.C. § 831k (2012). Our law, Mississippi Code Section 77-5-225, states,

> [T]he corporate purpose of a corporation shall be to render service to its members only. *Any person may become and remain a member if such person shall use energy supplied by such corporation and shall comply with the terms and conditions in respect to membership contained in the bylaws of such corporation, which terms and conditions shall be nondiscriminatory*.

Miss. Code Ann. § 77-5-225 (emphasis added). And the relevant federal statute, which governs contracts entered into with the Tennessee Valley Authority and which likewise governs ACE, provides,

> That all contracts entered into between [TVA] and any municipality or other political subdivision or cooperative organization *shall provide that the electric power shall be sold and distributed to the ultimate consumer without discrimination as between consumers of the same class*, and such contract shall be voidable at the election of the [TVA] if a discriminatory rate, rebate, or other special concession is made or given to any consumer or user by the municipality or other political subdivision or cooperative organization[.]

16 U.S.C. § 831k (emphasis added).

13

¶26. Thus, ACE cannot discriminate among its members by charging more or less of members in the same class. For that reason, ACE must attempt to collect from The Door Shop the undercharged amounts—to do otherwise would permit prohibited discrimination, state and federal, among ratepayers in the same class. And while The Door Shop maintains that remitting payment to ACE results in discrimination, the opposite rings true. For ACE *not* to pursue payment from The Door Shop discriminates against other members in the same class as The Door Shop who have purchased from ACE all electricity consumed. Such a windfall in favor of The Door Shop cannot be tolerated.

### B. Six-Year Overbilling or Underbilling Limit

¶27. As to The Door Shop's argument that any repayment should be capped at six years, we disagree. The Door Shop's argument is premised upon recently enacted law, in which our Legislature provided,

> In any action or regulatory proceeding arising from any overbilling or underbilling by a corporation, no collection, reimbursement, or other relief may be awarded for underbillings or overbillings occurring *more than six (6) years prior to the commencement of the action* or regulatory proceeding.

Miss. Code Ann. § 77-5-259 (Rev. 2018). But, as The Door Shop concedes, Section 77-5-259 was enacted *after* the filing of ACE's January 2014 complaint. And, as this Court has held, "[i]f the statutory language mandates that the statute is to apply from and after passage, it is not to be applied retroactively to causes of action which accrued prior to passage of the statute." ***Jones v. Baptist Mem'l Hosp.-Golden Triangle, Inc.***, 735 So. 2d 993, 998 (Miss. 1999). Here, the statute makes clear it does not apply retroactively; therefore, it cannot be

14

applied to this action, which accrued prior to the statute's passage. *See* Miss. Code Ann. §

77-5-259. As a result, we hold that ACE was entitled to judgment as a matter of law, and

that the circuit court did not err in granting summary judgment.[7]

## CONCLUSION

¶28. At bottom, The Door Shop purchased but a fraction of the electricity it admittedly

used. As a result, ACE sought payment for the undercharged amount. The circuit court held

that, as a matter of law, The Door Shop must pay. We agree and affirm the circuit court's

judgment.

¶29. **AFFIRMED.**

**WALLER, C.J., RANDOLPH, P.J., COLEMAN, BEAM AND CHAMBERLIN, JJ., CONCUR. KING, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J. MAXWELL, J., NOT PARTICIPATING.**

**KING, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶30. Although I agree with the majority's conclusion that the Mississippi Public Service

Commission (MPSC) lacked jurisdiction in this case, I respectfully disagree with the

---

[7] Although the issue has not been raised by The Door Shop in its briefs on appeal, we note that Mississippi Code Section 15-1-5 (Rev. 2012) provides that our general three-year statute of limitations "shall not be changed in any way whatsoever by contract between parties." As such, it would appear that Section 15-1-5 calls into question ACE's underbilling bylaw, which does not limit its right to assert a claim for relief. But a statute of limitations is an affirmative defense that must be pleaded and, if not raised, is waived. *See* M.R.C.P. 8(c); *see also* **Kimball Glassco Residential Ctr., Inc. v. Shanks**, 64 So. 3d 941, 945 (Miss. 2011). Unfortunately, The Door Shop totally failed to raise Section 15-1-5 as an affirmative defense; therefore, it was waived. We decline to address it here, as the issue is not properly before us. *See **id.***

15

majority's statement in footnote 7 that The Door Shop failed to raise Mississippi Code Section 15-1-5 as an affirmative defense. The Alcorn County Electric Power Association (ACE) filed its complaint on January 17, 2014. The Door Shop filed its answer on May 28, 2014, in which it stated, "Defendant pleads all applicable Statute of Limitations." Subsequently, the Mississippi Legislature enacted Mississippi Code Section 77-5-259, which provides,

> In any action or regulatory proceeding arising from any overbilling or underbilling by a corporation, no collection, reimbursement, or other relief may be awarded for underbillings or overbillings occurring more than six (6) years prior to the commencement of the action or regulatory proceeding.

Miss. Code Ann. § 77-5-259 (Rev. 2018). The Door Shop, in its response to ACE's motion for summary judgment, argued that Section 77-5-259 barred recovery for any underbilling that occurred more than six years from the date this suit was filed, January 17, 2014. Although I agree with the majority's finding that Section 77-5-259 does not apply retroactively, I would find that The Door Shop sufficiently raised a statute-of-limitations defense.

¶31. The Door Shop pleaded all applicable statute of limitations in its answer to ACE's complaint. In its response to ACE's motion for summary judgment, The Door Shop again argued that this case was barred by the statute of limitations. Mississippi Code Section 15-1-49 provides a general three-year statute of limitations to "all actions for which no other period of limitation is prescribed." Miss. Code Ann. § 15-1-49 (Rev. 2012). Additionally, Mississippi Code Section 15-1-5 states,

16

> The limitations prescribed in this chapter shall not be changed in any way whatsoever by contract between parties, and any change in such limitations made by any contracts stipulation whatsoever shall be absolutely null and void, the object of this section being to make the period of limitations for the various causes of action the same for all litigants.

Miss. Code. Ann. § 15-1-5 (Rev. 2012). Pursuant to this State's notice-pleading standard, The Door Shop's answer was sufficient to preserve the statute of limitations as a defense. *See* M.R.C.P. 8(c), (e); ***Scafidi v. Hille***, 180 So. 3d 634 650 (Miss. 2015) ("Mississippi is a 'notice pleadings' state. . . . 'Each averment of a pleading shall be simple, concise, and direct. No technical forms of pleadings or motions are required.'"). "Just as Rule 8(a) requires only that the plaintiff give the defendant notice of the claims, Rule 8(c) requires only that the defendant give the plaintiff notice of the defense." M.R.C.P. 8 Advisory Comm. Notes. I would find that, although The Door's Shop referenced the incorrect statute in its motion for summary judgment, it sufficiently raised as an affirmative defense that the general statute of limitations barred recovery of underbilled amounts.

¶32.    Further, I respectfully dissent from the majority's holding that ACE's amended bylaw applied retroactively. I would find that a genuine issue of material fact exists regarding whether ACE empowered itself to recover undercharged amounts prior to 2009.

¶33.    The Door Shop applied for new services from ACE in October 2004 and, in doing so, bound itself to ACE's bylaws. The Door Shop submitted full payment for the amount ACE billed each month. However, due to a clerical error, ACE had undercharged The Door Shop from 2004 to 2011. Pursuant to Article II, Section 12, of ACE's bylaws, upon discovering

17

the error in 2011, ACE corrected its mistake and billed The Door Shop for the undercharged amount, totaling $25,685.58. Article II, Section 12, of ACE's bylaws provides,

> Section 12. Under Billing. In the event that a billing or other error by [ACE] results in a member being undercharged for the actual amount of electricity provided to the member by [ACE], then upon discovery of the error, and regardless of the cause or duration of the error, [ACE] will issue a supplemental billing reflecti[ng] the corrected amount owed by the member; and the member shall remit payment to [ACE] for such supplemental billing.
> . . .

However, Article II, Section 12, was adopted in 2009. Prior to 2009, and when The Door Shop applied for new services, ACE's bylaws contained no provision authorizing itself to collect undercharged amounts. The Door Shop argues that, because that provision of the bylaws was not adopted until five years after it applied for service, it should only be responsible for payment from the date that the bylaw was adopted.

¶34. The majority finds that, regardless of when Article II, Section 12, was adopted, Article VII, Section 12, of ACE's 1997 bylaws authorized ACE to collect undercharged amounts. I disagree. Article VII, Section 12, states,

> Section 12. Purchase of Electric Energy. Each member shall, as soon as electric energy is available, purchase from [ACE] all electric energy used on the premises described in the application for membership, and shall pay promptly therefore monthly at such rates as may be fixed by the Board of Directors from time to time.

The majority reasons that the above provision, which had been adopted in 1997, required members to pay for all electricity used on the premises. Although Article VII, Section 12, states that the member should pay for "all electric energy used on the premises," the

18

provision contained no procedure to collect the undercharged amount until the adoption of the new bylaw in 2009. *See **Nibco Inc. v. City of Lebanon***, 680 F. App'x. 428, 430 (6th Cir. 2017). In ***Nibco***, a misapplied multiplier caused a municipality to underbill a customer for electricity over a period of sixty-five months, resulting in an undercharge of $1.27 million. ***Id.*** The Sixth Circuit held that, because the City of Lebanon's ordinance was silent about any procedure or protocol for addressing or correction billing mistakes, it had no authority to justify backbilling. ***Id.*** at 435.

¶35.   Similarly, in this case, prior to 2009, ACE's bylaws contained no provision authorizing recoupment for undercharges. Evidence of this is shown by ACE's amendment of its bylaws in 2009, which stated that upon discovery of the error, ACE would issue a supplemental billing reflecting the correct amount owed by the member. Thus, the 2009 amendment provided ACE's procedure to recover for undercharged amounts. The bylaw adopted by the Board in 2009, if applied retroactively, would enable the Board to recover for billing errors dating back to ACE's inception in 1934. That interpretation would be neither reasonable nor fair. In a similar case, the Supreme Court of Georgia reasoned,

> It is simply unjust to require an innocent consumer to bear the entire cost of a supplier's mistake where, as here, there is no time limit on back billings. Armed with absolute immunity for an indefinite time, the supplier has little incentive to establish reasonable procedures to guarantee that its meters are properly calibrated or that its bills are computed accurately.

***Brown v. Walton Elec. Membership Corp.***, 531 S.E.2d 712, 713 (Ga. 2000). Here, The Door Shop agreed to abide by ACE's bylaws when it applied for service in 2004. However, not

until 2009 did ACE authorize itself to recover for underbilled amounts. The Door Shop promptly paid in full for the amount of electric energy for which it was billed each month and, through no fault of its own, was undercharged for the amount of electricity it had used. It would be unjust to require The Door Shop to bear the cost of ACE's mistake for an indefinite time. Because prior to 2009 ACE's bylaws had no provision authorizing it to collect on underbilled accounts, I would find that a material issue of fact exists about whether ACE is able to collect any underbilled amount prior to that point. Therefore, I would reverse the trial court's grant of summary judgment and would remand this case for a trial on the merits.

**KITCHENS, P.J., JOINS THIS OPINION.**