# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

North American Rescue Products, Inc.,
Respondent/Petitioner,

v.

P. J. Richardson, Petitioner/Respondent.

Appellate Case No. 2012-208586

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Greenville County
The Honorable Steven H. John, Circuit Court Judge

---

Opinion No. 27475
Heard November 19, 2014 – Filed January 7, 2015

---

## REVERSED

---

Robert L. Widener, of McNair Law Firm, P.A., of Columbia, and Bernie W. Ellis, of McNair Law Firm, P.A., of Greenville, for Respondent/Petitioner.

C. Mitchell Brown and A. Mattison Bogan, both of Nelson Mullins Riley & Scarborough, LLP, of Columbia, and Rivers S. Stilwell, of Nelson Mullins Riley & Scarborough, LLP, of Greenville, for Petitioner/Respondent.

---

**JUSTICE HEARN:** This declaratory judgment action was commenced by North American Rescue Products, Inc. (NARP) to determine whether P. J. Richardson had the right to purchase 7.5 % of NARP's stock at a discounted price despite the existence of a termination agreement which purported to end the parties' relationship. Following a jury verdict allowing Richardson to purchase the stock for $2,936,000.00, both parties appealed. We granted certiorari to review the court of appeals' decision affirming the jury verdict. Because we find the termination agreement unambiguously ended any right Richardson had to purchase the stock, we reverse and remand for entry of judgment in favor of NARP.[1]

## FACTUAL/PROCEDURAL HISTORY

NARP, owned by Bob Castellani, manufactures emergency medical and rescue products for the U.S. Armed Forces. P.J. Richardson owned Reeves Manufacturing, Inc. (Reeves), which manufactured emergency medical and rescue products for civilian first responders. Because the companies produced similar products but sold to different markets, Castellani and Richardson formed a close business and personal relationship whereby they promoted and cross-sold each other's products. In January 2000, Castellani and Richardson formalized their relationship by entering into an Outline of Business Relationship (2000 Outline). As part of the 2000 Outline, Castellani and Richardson agreed to issue 25% of their companies' stock to each other.[2]

In July 2004, Castellani and Richardson orally agreed to reduce the percentages of stock to 7.5% at a meeting in Charleston (The Charleston Agreement). In October 2004, with the sale of Reeves pending, Castellani and Richardson met in Atlanta to discuss the agreement. The parties subsequently executed an "Agreement of Termination, Settlement, and Release" (Termination Agreement). The Termination Agreement, which was signed by Richardson and Castellani in November, 2004, reads in pertinent part:

---

[1] We withdraw our previous opinion in *North American Rescue Products, Inc. v. Richardson*, Op. No. 2014–MO–009 (S.C. Sup. Ct. filed March 26, 2014), substituting this one in its place.

[2] At trial, Castellani described the stock swap as a means of hedging their bets in starting a small business: "It was kind of like an insurance policy. We both had pretty good companies. We had a lot of hurdles in front of us. The odds of both of us making it were probably not great, but the odds of one of us surviving was probably pretty good."

1. Termination of the 2000 Outline.  The parties agree that the 2000 Outline and any and all agreements, understandings, undertakings or arrangements that in any way arose or may have arisen out of or relate in any manner to the 2000 Outline, are *terminated*.

2.  Settlement.  *All claims and potential claims* of any nature whatsoever that have been, could have been, or in the future could be asserted by the parties *arising out of or relating in any manner to the 2000 Outline are hereby settled, compromised and released* for and in consideration of the payment by [Reeves/Richardson] of the sum of $100.00 in lawful money of the United States of America to NARP and [Castellani].

. . .

4. NARP and [Castellani] Release. [Reeves] and [Richardson] hereby remise, release and forever discharge each of NARP and [Castellani], along with their respective directors, officers, stockholders, controlling persons, employees, agents, predecessors, successors, and assigns, and agents, of and from all, and all manner of, actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions, claims and demands whatsoever, whether in law or equity, which [Reeves] and/or [Richardson] had, now have or which any personal representative, heir, predecessor, successor or assign of [Reeves] and/or [Richardson] can, shall or may have against NARP and [Castellani] or their respective directors, officers, stockholders, controlling persons, employees, agents, predecessors, successors and assigns, arising out of or relating to the 2000 Outline from the beginning of time to the date of this Settlement Agreement.  *It is specifically agreed and understood by the parties that the foregoing release is not intended to, and shall not release, any of the parties from that certain, separate Option Agreement dated 15 Dec, 2004 pursuant to which NARP and [Castellani] have granted [Richardson] an option to purchase 7.5% of the capital stock of NARP.*[3]

---

[3] The "15 Dec" date was handwritten in an underlined blank space.  An identical provision titled "[Reeves] and [Richardson] Release" contained the same handwritten date.

. . .

> 6. <u>Entire Agreement</u>. This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter contained herein, and merges all prior discussions and agreements, both oral and written, between the parties.

(emphasis added). Although the Termination Agreement twice references a later agreement of "15 Dec," both parties agree that no option agreement existed at the time and no option agreement dated December 15, 2004 was ever entered into.

Two years after the execution of the Termination Agreement, Richardson filed a demand letter seeking to exercise his purported option to purchase 7.5% of NARP's stock.[4] NARP then filed this declaratory judgment action to determine whether Richardson had any such right. Richardson answered and counterclaimed for specific performance for breach of contract and promissory estoppel.

At trial, NARP argued the Termination Agreement ended all obligations between the parties arising from the 2000 Outline. Conversely, Richardson argued the Termination Agreement was part of a three-part agreement whereby the 2000 Outline was to be terminated, an option agreement was to be executed granting Richardson an option to purchase NARP stock, and Richardson was to donate 7.5% of the proceeds from the sale of Reeves to a charity of Castellani's choosing. At the close of its case, NARP moved for directed verdict on Richardson's breach of contract counterclaim, arguing the Termination Agreement unambiguously terminated Richardson's right to purchase NARP stock. The trial court denied NARP's motion, holding "the terms of that contract are absolutely ambiguous. Read as a whole, it borders on being completely un-understandable."

---

[4] We note that Richardson has on numerous occasions changed his argument as to the source of his right to purchase NARP stock. Initially, Richardson claimed he had a right to purchase 7.5% of NARP's stock for a penny per share based on an October 4, 2014 option agreement which he admitted at trial was never executed. He then amended his pleadings twice to argue he had a right to purchase NARP stock for a penny per share arising from an oral agreement entered into during the Atlanta meeting. It was only at trial when Richardson asserted the theory on which his appeal rests—that he has the right to purchase 7.5% of NARP's stock in exchange for 7.5% of the proceeds from the sale of Reeves, or $415,988.

At the close of all evidence, NARP renewed its motion for directed verdict on Richardson's breach of contract counterclaim, and moved for directed verdict on Richardson's promissory estoppel counterclaim. Both motions were denied. The case went to the jury on a special verdict form, and the jury returned a verdict finding Richardson was entitled to receive 7.5% of NARP's stock for the price of $2,936,300.00.

Both parties appealed, and the court of appeals affirmed. *N. Am. Rescue Prod., Inc. v. Richardson*, 396 S.C. 124, 720 S.E.2d 53 (Ct. App. 2011). This Court granted certiorari and affirmed the court of appeals' opinion in part and vacated in part. *N. Am. Rescue Prod., Inc. v. Richardson*, Op. No. 2014–MO–009 (S.C. Sup. Ct. filed March 26, 2014). The parties filed cross petitions for rehearing, both of which we granted.

## ISSUES PRESENTED

I.      Did the court of appeals err in affirming the trial court's denial of NARP's motion for directed verdict on Richardson's contract claim?

II.      Did the court of appeals err in affirming the trial court's denial of NARP's motion for directed verdict on Richardson's promissory estoppel claim?

## LAW/ANALYSIS

## I.      DIRECTED VERDICT ON BREACH OF CONTRACT COUNTERCLAIM

NARP argues the court of appeals erred by affirming the trial court's denial of its directed verdict motion on Richardson's breach of contract claim. We agree.

When considering a directed verdict motion, the trial court is required to view the evidence in the light most favorable to the nonmoving party. *Jones v. Lott*, 387 S.C. 339, 345, 692 S.E.2d 900, 903 (2010). This Court will reverse the trial court's ruling only where there is no evidence to support the ruling or it is controlled by an error of law. *Id.*

The primary concern of the court interpreting a contract is to give effect to the intent of the parties. *Lee v. Univ. of S.C.*, 407 S.C. 512, 517, 757 S.E.2d 394, 397 (2014). The best evidence of the parties' intent is the contract's plain language. *Id.*

The question of whether a contract is ambiguous is a question of law. *Id.* A contract is ambiguous when it is capable of more than one meaning or when its meaning is unclear. *Ellie, Inc. v. Miccichi*, 358 S.C. 78, 93, 594 S.E.2d 485, 493 (Ct. App. 2004). If a contract's language is unambiguous, the plain language will determine the contract's force and effect. *Lee*, 407 S.C. at 517–18, 757 S.E.2d at 397.

A contract must be read as a whole document so that one party may not create ambiguity by pointing out a single sentence or clause. *S. Atl. Fin. Servs., Inc. v. Middleton*, 356 S.C. 444, 447, 590 S.E.2d 27, 29 (2003). "Interpretation of a contract is governed by the objective manifestation of the parties' assent at the time the contract was made, rather than the subjective, after-the-fact meaning one party assigns to it." *Laser Supply & Servs., Inc. v. Orchard Park Assoc.*, 382 S.C. 326, 334, 676 S.E.2d 139, 143–144 (Ct. App. 2009).

We fail to discern any ambiguity in the Termination Agreement and find it clearly terminated the obligations between the parties. In pertinent part, the Termination Agreement states: "The parties agree that the 2000 Outline and any and all agreements, understandings, undertakings or arrangements that in any way arose or may have arisen out of or relate in any manner to the 2000 Outline are terminated." Additionally, both parties are released from "[a]ll claims and potential claims of any nature whatsoever . . . arising out of or relating in any manner to the 2000 Outline." The only provisions of the Termination Agreement which stand in contradiction are those which purport to reserve Richardson's rights under a separate option contract dated "Dec 15." However, both parties agree that no option contract dated December 15, 2004 was ever created or executed. We decline to hold that a provision mentioning a nonexistent document can defeat the plain language of an agreement.

Testimony from Richardson's wife and his former attorney support his claim that the Termination Agreement was one part of a three-part agreement which was meant to be executed contemporaneously with the others. However, only if the document itself creates an ambiguity should a court look to outside evidence to aid in interpretation. *See Laser Supply & Servs.*, 382 S.C. at 334, 676 S.E.2d at 144 ("Once the court decides that the language is ambiguous, evidence may be admitted to show the intent of the parties.") Further, even if the parties intended a tripartite agreement, the Termination Agreement was the only part executed. Provisions which are essentially agreements to agree in the future have no legal

effect. *See Ellis v. Taylor*, 316 S.C. 245, 249, 449 S.E.2d 487, 489 (1994) ("A contract provision leaving material terms open for future agreement is void for indefiniteness."). Thus the mere mention of a future option agreement that was never executed does not create an ambiguity in an otherwise unambiguous document. Accordingly, the court of appeals erred in affirming the trial court's denial of NARP's motion for directed verdict.

## II.    DIRECTED VERDICT ON PROMISSORY ESTOPPEL CLAIM

NARP also argues the court of appeals erred in affirming the trial court's denial of its directed verdict motion as to Richardson's promissory estoppel claim. We agree.

Promissory estoppel is a quasi-contract remedy. *See Higgins Constr. Co. v. S. Bell Tel. & Tel. Co.*, 276 S.C. 663, 665, 281 S.E.2d 469, 470 (1981). Courts have used the doctrine where the refusal to apply it "'would be virtually to sanction the perpetration of a fraud or would result in other injustice.'" *Satcher v. Satcher*, 351 S.C. 477, 484, 570 S.E.2d 535, 538 (Ct. App. 2002) (quoting *Citizens Bank v. Gregory's Warehouse, Inc.*, 297 S.C. 151, 154, 375 S.E.2d 316, 318 (Ct. App. 1988)). The elements of promissory estoppel are (1) an unambiguous promise by the promisor; (2) reasonable reliance on the promise by the promisee; (3) reliance by the promisee was expected by and foreseeable to the promisor; and (4) injury caused to the promisee by his reasonable reliance. *Davis v. Greenwood Sch. Dist. 50*, 365 S.C. 629, 634, 620 S.E.2d 65, 67 (2005).

Because the Termination Agreement severed "any and all agreements, understandings, undertakings or arrangements that in any way arose or may have arisen out of or relate in any manner to the 2000 Outline," it precludes any promissory estoppel claim that could have arisen between the parties prior to the Termination Agreement. Further, there is no evidence in the record to support a promissory estoppel claim arising after the Termination Agreement was executed. While there is evidence Castellani made subsequent assurances to Richardson—for instance, Castellani wrote in an e-mail that "nothing has changed in my mind about getting this done for you and [your family]"—none of these statements rise to the level of an unambiguous promise. Finally, there is no evidence Richardson relied on any alleged promises by Castellani to his detriment; he argues to this Court only that he held 7.5% of the proceeds from the sale of Reeves for the potential exchange for NARP stock, but does not explain how that prejudiced him.

Accordingly, the court of appeals erred in affirming the trial court's denial of NARP's directed verdict motion as to Richardson's promissory estoppel claim.[5]

## CONCLUSION

We hold the court of appeals erred in affirming the trial court's denial of NARP's motions for directed verdict on Richardson's breach of contract and promissory estoppel counterclaims. Accordingly, we reverse and remand to the trial court for entry of judgment in favor of NARP.

**TOAL, C.J., PLEICONES, BEATTY, JJ., and Acting Justice James E. Moore, concur.**

---

[5] Because our ruling on the issues raised by NARP are dispositive, we need not address Richardson's appeal. *See Earthscapes, Unlimited, Inc. v. Ulbrich*, 390 S.C. 609, 617, 703 S.E.2d 221, 225 (2010) (holding an appellate court need not address remaining issues on appeal when disposition of a prior issue is dispositive).