# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-CA-00566-SCT

*MARC B. DANIELS, SANDRA DANIELS,*
*CROCKER & ASSOCIATES, INC. f/k/a D & D*
*ENVIRONMENTAL, INC. AND MAXX*
*INVESTMENTS, LLC*

*v.*

*J. DENNIS CROCKER, GAIL CROCKER,*
*CROCKER, LTD., A SOUTH CAROLINA*
*CORPORATION AND GENERATIONAL EQUITY,*
*LLC*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/06/2016 |
| TRIAL JUDGE: | HON. JOHN HUEY EMFINGER |
| TRIAL COURT ATTORNEYS: | ROY H. LIDDELL |
| | RICHARD L. FARLEY |
| | STEPHEN HUWE |
| | C. MICHAEL ELLENBURG |
| | ERIC F. HATTEN |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | ROY H. LIDDELL |
| ATTORNEYS FOR APPELLEES: | ERIC F. HATTEN |
| | CHRISTOPHER D. MEYER |
| | RICHARD L. FARLEY |
| | REBECCA K. LINDAHL |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED IN PART; REVERSED IN PART AND REMANDED - 06/08/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, P.J., KITCHENS AND CHAMBERLIN, JJ.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1.     This appeal arises from a breach-of-contract action between Marc Daniels, Sandra

Daniels, Crocker & Associates, Inc., and Maxx Investments, LLC (collectively, "the

Danielses") and Dennis Crocker, Gail Crocker and Crocker, Ltd. (collectively, "the Crockers"). The Danielses entered into an Asset Purchase Agreement (the "Agreement") with the Crockers to acquire Crocker & Associates, Inc. ("C&A") on March 31, 2011.[1] Within eighteen months of the sale, C&A lost a number of important contracts and its employees resigned.

¶2.     The Danielses then sued the Crockers for failing to disclose all material information about C&A as required by the Agreement. The Crockers answered the suit and brought counterclaims against the Danielses. After extensive discovery, the trial court granted the Crockers' motion for summary judgment on the Danielses' claims against them. The Danielses now appeal the trial court's grant of summary judgment. After review of the record, we affirm in part and reverse in part the grant of summary judgment and remand the case for further proceedings.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶3.     In 1969, Dennis Crocker cofounded Aqua Aerobic Systems ("Aqua"), an applied engineering business that provides solutions to municipal and industrial wastewater and water-treatment customers. In 1977, Dennis left Aqua and founded C&A in Rock Hill, South Carolina. Despite leaving Aqua, Dennis retained his minority shareholder's interest in Aqua as well as a seat on Aqua's board. C&A was a sales representative firm for manufacturers of water and wastewater-treatment equipment. It represented Aqua exclusively in several

---

[1] In early 2011, Marc formed D&D Environmental, Inc., to acquire the assets of C&A. At the time of the sale, D&D changed its name to C&A, and the original C&A changed its name to Crocker, Ltd. Where these legal distinctions are not relevant, we will refer to C&A throughout the opinion.

territories—Virginia, North Carolina, South Carolina, Georgia, Alabama, and portions of Florida and Tennessee. Aqua guaranteed these territories to C&A by entering into contracts for each territory; the contracts were terminable with thirty days' notice. Since its founding, C&A was regularly Aqua's number one representative firm in sales. Aqua represented fifty to seventy percent of C&A's revenue, depending on the year.

¶4. C&A's business model functioned on a long cycle. From the time it booked a project until it received the commission from the booking was, generally, twelve to eighteen months. Therefore, it was possible to look at a base year of bookings and project a picture of future revenue twelve to twenty-four months in the future.

¶5. Dennis retired from C&A in 2003 and turned over the management of C&A to his wife Gail Crocker; later, in 2010, he gave Gail fifty percent of his interest in C&A. While Gail testified that she was "scared to death" that Aqua would cancel its contracts with C&A after Dennis retired, Aqua did not cancel its contracts with C&A until years later after C&A was sold.

¶6. In 2010, Marc Daniels, a certified public accountant (CPA), reviewed an offering memorandum for C&A. Generational Equity ("GE"), a business broker, had compiled the memorandum based on information it had received from the Crockers. After reviewing the offering memorandum, Marc and his brother Stephen Daniels, met the Crockers in South Carolina for an initial due-diligence meeting.

¶7. After the initial meeting, the Crockers provided the Danielses with financial disclosures of past revenue and present bookings at the request of the financial institution

3

that was going to finance a portion of the transaction. Over a period of months, the Crockers and the Danielses exchanged financial information concerning C&A, negotiated, and settled on a purchase price of $4,000,000 for C&A. Of this figure, $2,800,000 was financed by a bank, and the remaining $1,200,000 was owner-financed by the Crockers.

¶8.    On March 23, 2011, eight days before the parties signed the Agreement, Dennis attended an Aqua board meeting at which the sale of Aqua was discussed. Dennis did not disclose this to the Danielses.

¶9.    The Danielses and the Crockers entered into the Agreement on March 31, 2011. On May 1, 2011, Marc—through Maxx Investments—agreed to pay $365,000 to the Crockers for Crocker, Ltd.'s goodwill.

¶10.    In October 2011—seven months after the sale of C&A and after the possibility of selling Aqua had dissipated, Dennis requested that Aqua redeem his stock. Aqua redeemed the stock in December, and Dennis retired from Aqua's board. In June 2012, Aqua canceled its representation contract with C&A for North and South Carolina. Soon after this, C&A's sales representatives resigned, and C&A lost its remaining contracts with Aqua.

¶11.    On October 11, 2012, the Danielses filed suit in Madison County circuit court against the Crockers, alleging that the Crockers had breached the Agreement by not disclosing "all material information relating to [(C&A)] or the transactions contemplated by this Agreement." The Crockers answered the complaint and alleged counterclaims against the Danielses. The parties took several depositions and conducted discovery. The Danielses also designated Robert Cunningham as an expert. Cunningham was deposed and prepared an

4

expert report.

¶12.    In December 2014, the Crockers filed a motion for summary judgment on the Danielses" claims against them.  On May 5, 2015, the trial court granted the Crockers' motion for summary judgment (the "May 5 order").  The Danielses filed a motion for reconsideration or, in the alternative, to certify the May 5 order under Mississippi Rule of Civil Procedure 54(b).  The trial court denied the motion, specifically denying both the reconsideration and the certification.

¶13.    Next, the Danielses and the Crockers filed competing motions for summary judgment on the Crocker's counterclaims.  On January 8, 2016, the trial court resolved the motions. On April 6, 2016, pursuant to the Danielses' renewed motion, the trial court certified its earlier May 5 order.  The trial court also stayed the proceedings "pending the appeal" of the May 5 order.

¶14.    The Danielses now appeal a number of issues that each relate to the trial court's grant of summary judgement in favor of the Crockers.[2]  We will first address where the trial court erred in granting summary judgment before addressing where the trial court properly granted summary judgment.

¶15.    The Crockers also cross-appealed the trial court's stay of their claims against C&A. By order filed March 2, 2017, this Court granted the Crockers' unopposed motion to dismiss their cross-appeal for lack of subject-matter jurisdiction.  Due to the factually intensive

---

[2] While Generational Equity is listed as an appellee in this appeal, the trial court's grant of summary judgment in favor of Generational Equity was not appealed and is unaffected by our decision.

nature of this appeal and the extensive record, additional facts and procedural history will be related throughout the analysis as necessary.

## STANDARD OF REVIEW

¶16. We review a trial court's grant of summary judgment de novo. *Mitchell v. Ridgewood E. Apartments, LLC*, 205 So. 3d 1069, 1073 (Miss. 2016) (citing *Borries v. Grand Casino, Inc.* 187 So. 3d 1042, 1045 (Miss. 2016)). Under Rule 56 of the Mississippi Rules of Civil Procedure, "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Miss. R. Civ. P. 56(c). The burden of demonstrating that no genuine issue of fact exists is on the moving party and "the non-moving party should be given the benefit of every reasonable doubt" *Borries*, 187 So. 3d at 1046. "The evidence is to be viewed in the light most favorable to the nonmoving party." *Mitchell*, 205 So. 3d at 1073 (citing *Stribling Inv., LLC v. Mike Rozier Constr. Co., Inc.*, 189 So. 3d 1216, 1219 (Miss. 2016)).

## ANALYSIS

¶17. Due to the Crockers' argument on the issue, we initially note that Cunningham's expert testimony and report is properly before the Court. It was not challenged in the trial court below other than argument of counsel at the summary judgment hearing.[3] We

---

[3] There was no substantive motion to exclude Cunningham's expert report or any of his testimony or opinions; there was also no ruling from the trial judge on the issue. We cannot determine whether the trial judge, in granting summary judgment, considered his testimony and report insufficient to create a genuine issue of material fact or simply did not

consistently have held that we "will not consider issues raised for the first time on appeal." ***Anderson v. LaVere***, 136 So. 3d 404, 410 (Miss. 2014) (citing ***Flagstar Bank, FSB v. Danos***, 46 So. 3d 298, 311 (Miss. 2010)); *see **Alexander v. Daniel***, 904 So. 2d 172, 183 (Miss. 2005) (recognizing "the practical effect of depriving the trial court of the opportunity to first rule on the issue."); *see also **Univ. of Miss. Med. Ctr. v. Peacock***, 972 So. 2d 619, 625 (Miss. Ct. App. 2006) (noting the lack of any ***Daubert***[4] challenge at the trial level). The report and testimony is in the record before us. To exclude it would require us to make a determination as to its admissibility de novo. Our settled review for the admission or exclusion of expert witnesses, though, is a review for an abuse of discretion. *See **Patterson v. Tibbs***, 60 So. 3d 742, 748 (Miss. 2011).

¶18. "The law by which a contract is to be governed is that which parties intended or may fairly be presumed to have intended." ***Cox v. Howard, Weil, Labouisse, Friedrichs, Inc.***, 619 So. 2d 908, 911 (Miss. 1993). Here, the Agreement's choice-of-law provision reads:

> (d) <u>Law Governing</u>. This Agreement shall be governed by and construed in accordance with the law of the State of South Carolina without regard to the choice of law principles of the State of South Carolina.

Given this provision, we will apply South Carolina law to the contract between the Danielses and the Crockers.

¶19. As a "[c]hoice of law analysis arises only when there is a true conflict between the laws of two states," we will apply Mississippi law to the remainder of the Danielses' claims.

---

consider the testimony and report at all.

[4] ***Daubert v. Merrell Dow Pharm., Inc.***, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

***Zurich Am. Ins. Co. v. Goodwin***, 920 So. 2d 427, 432 (Miss. 2006).  There is no "true conflict between the laws of" Mississippi and South Carolina on any of the Danielses' noncontractual claims.  ***Id***.

> **I.    The trial court erred in granting summary judgment on the Danielses' contract, negligent and fraudulent misrepresentation, and punitive damages claims.**

¶20.    Because the record contains a genuine issue as to material fact concerning the Danielses' contract claims and negligent and fraudulent misrepresentation claims, the trial court erred in granting summary judgment on these claims.  Further, because we are remanding claims to be tried by a jury to determine if the Danielses are entitled to compensation, we reverse the trial court's grant of summary judgment on the punitive damages claim.

> **A.    Contract**

¶21.    In South Carolina, "[a]n action for breach of contract is an action at law." ***Lee v. Univ. of S.C.***, 757 S.E.2d 394, 397 (S.C. 2014).  "To recover for a breach of contract, the plaintiff must prove: (1) a binding contract; (2) a breach of contract; and (3) damages proximately resulting from the breach." ***Hennes v. Shaw***, 725 S.E.2d 501, 506 (S.C. Ct. App. 2012) (citing ***Fuller v. E. Fire & Cas. Ins. Co.***, 124 S.E.2d 602, 610 (S.C. 1962)). Under South Carolina law, "[t]he primary concern of the court interpreting a contract is to give effect to the intent of the parties." ***N. Am. Rescue Prod., Inc. v. Richardson***, 769 S.E.2d 237, 240 (S.C. 2015).  "A contract is ambiguous when it is capable of more than one meaning or when its meaning is unclear." ***Id***.  "If a contract's language is unambiguous, the plain language will determine the contract's force and effect." ***Id***.

8

¶22.    The warranty provision at issue here governed the Crockers' duty to disclose material information to the Danielses. The warranty stated:

> 8.  <u>Representations and Warranties of the Seller</u>. To induce the Buyer to enter into this Agreement, the Seller and the Crockers make the following representations and warranties:
> . . .
>
> (m)    <u>Material Fact</u>.  No representation or warranty by the seller contained in this Agreement, and no statement contained in the schedules or any other document, certificate or other instrument delivered or to be delivered by or on behalf of the Seller, pursuant to this Agreement, contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact necessary, in light of the circumstances under which it was or will be made, in order to make the statements herein or therein not misleading. *The Seller has disclosed to the Buyer all material information relating to the Business or the transactions contemplated by this Agreement.* . . .

(Emphasis added.)  The terms "material fact" and "material information" are not defined within the Agreement.  The Agreement, though, is not ambiguous.

¶23.    Therefore, we look to the plain language of the words to interpret the Agreement.  A "fact" is "[s]omething that actually exists . . . .  Facts include not just tangible things . . . but also states of mind such as intentions . . . ." *Fact*, *Blacks Law Dictionary* (10th ed. 2014). A "material fact" is one "that is significant or essential to the issue or matter at hand; esp., a fact that makes a difference in the result to be reached in a given case." *Id*.  "Material information" is "[i]nformation that would be important to a reasonable investor in making an investment decision." *Id*.

### 1.    *2010 Drop in Bookings*

¶24.    The Danielses claim the Crockers failed to disclose a forty-two-percent drop in C&A's bookings in 2010.  The Crockers claim that their disclosures to the Danielses were

9

sufficient; they argue that the Danielses knew the number of projects that had been booked in 2010 and could extrapolate the amount of expected future revenue from those bookings. We find, though, that there are genuine issues of material fact as to whether the Crockers disclosed "all material information" concerning C&A's drop in bookings.

¶25. The offering memorandum—compiled from information GE received from the Crockers—discussed C&A, its financial history, and its industry. The memorandum also included past revenue numbers for C&A as well as revenue predictions. The offering memorandum showed a 26.5 percent decrease in revenue for 2010 but predicted a 17.9 percent growth for 2011. In her deposition, Gail admitted that "the Offering Memorandum was prepared based primarily upon information that Dennis and I provided to Generational Equity. The Offering Memorandum contains historical income figures of [C&A] and also projected future performance. I provided the projected future performance numbers." A genuine issue of material fact remains as to whether the Danielses could have been aware of a drop in bookings in 2010 from the information in the offering memorandum.

¶26. Marc's and Gail's affidavits demonstrate multiple genuine issues of material fact as to whether Marc was aware of C&A's drop in bookings in 2010. Marc denied that Gail and Dennis had told him about a drop in bookings at C&A. He claimed, "Neither Gail nor Dennis disclosed that bookings in 2010 had dropped precipitously—by over 40%—either at the [October 2010 due diligence] meeting in Rock Hill or at any other time before the sale of [C&A]." Gail claimed to have told Marc that bookings had dropped in 2010. In her affidavit, she alleged, "At this meeting, we also told Marc that 2010 sales or bookings were lower than usual, and I explained to him the reasons for that. Marc clearly understood that

10

2010 was a down year in sales for [C&A]."

¶27. As part of the documents requested by the lender, the Crockers sent an outstanding commissions report, dated November 30, 2010, that showed the number of bookings that were booked and uncollected by C&A. In his affidavit, Marc addressed the November 2010 report provided by the Crockers:

> Th[e] report . . . does not–and did not–convey to me the decline in bookings from 2009 to 2010 or the alarming trajectory of [C&A's] prospects, as it was only a snapshot of bookings as a point in November before year end and, in the absence of any disclosures[] of any history of orders in prior years, no context was provided even for the limited information that was provided. Nor was this raw November 2010 orders data supplied with any explanation that would have led me to look critically or more closely at 2010 bookings and their impact on revenues in the next two years.

¶28. Thus, it is undisputed that the Crockers did disclose some information concerning C&A's actual bookings in 2010. However, factual questions are evident in the record that must be resolved by a jury as to whether the disclosures revealed 2010's actual drop in bookings and its severity.

¶29. Further, correspondence that Gail did not disclose to the Danielses, which she had sent to the C&A staff, evidences knowledge of both a drop in 2010 bookings and its severe effect on the business. On September 1, 2010, to the C&A sales representatives, Gail wrote,

> I regret to have to inform you that Melissa is no longer with us. *The decision was strictly an economic one* and did not come easy. As a result of *the slump in bookings this year*, I found it necessary to start preparing for a potential *cash flow problem* next year.

(Emphasis added.) The next day, on September 2, 2010, again, to the sales representatives, Gail wrote, "It's not a secret that our 2010 year to date is very slim (understatement);" On January 19, 2011—months before the sale to the Danielses, Gail sent a year-end

11

memorandum to the sales force. In the memorandum, Gail wrote, "As we are all aware, our 2010 bookings were pretty sad, however, without belaboring the point, let's just all breathe a sigh of relief that 2010 is now over."

¶30. Gail acknowledged that the drop in bookings from 2009 to 2010—more than forty percent—was "fairly dramatic." When questioned about whether she told the Danielses about the effect that yearend 2010 bookings would have on revenues, she responded, "No, nor did he ask."

¶31. The Danielses also offer evidence concerning the materiality of the failure to disclose the 2010 drop in bookings. Brandy Hefner, a credit analyst who assisted in underwriting the Danielses' loans to purchase C&A, testified that no one informed her that there had been a slump in bookings at C&A. She further testified that a decline in bookings would be the type of information that she would expect a seller to disclose, and if it had been disclosed, she would have disclosed it to the financial institution issuing the loan for its consideration.

¶32. Lastly, Cunningham's testimony and report demonstrated that (1) the Danielses' due diligence was sufficient and (2) the Danielses suffered damages due to the Crockers' failure to disclose material information about the 2010 drop in bookings. Cunningham testified that the Crockers "could have been . . . more forthcoming." Overall, Cunningham felt that Marc had "performed reasonable due diligence." Further, Cunningham's report showed that the Danielses had paid $2,915,000 in excess of the estimated fair market value of C&A.

¶33. The trial court's reliance on *Gardner v. Little*, 755 So. 2d 1273 (Miss. Ct. App. 2000), for the proposition that the Danielses had ample time "to investigate the financial status" of C&A was error. In *Gardner*, the addendum to the purchase agreement provided: "Sellers do

12

not warrant the absolute accuracy of any financial statements, and Purchasers are not relying on any of same to consummate this transaction." *Id*. at 1274. Here, though, "to induce the [Danielses] to enter into this Agreement," the Crockers specifically warranted that "[n]o representation or warranty . . . in this Agreement . . . omits or will omit to state any material fact necessary, in light of the circumstances under which it was or will be made, in order to make the statements herein or therein not misleading." The Crockers also warranted that they had "disclosed to the Buyer all material information relating to the Business or the transactions contemplated by this Agreement." In *Gardner*, the sellers included a disclaimer concerning the accuracy of the information. *Id*. *Gardner* is distinguishable here where the Crockers claimed both that the information disclosed was accurate and that they had disclosed all material information.

¶34. Gail and Dennis assumed a contractual duty to disclose the 2010 drop in bookings. The evidence in the record demonstrates a factual dispute for the jury to resolve as to whether the actual 2010 drop in bookings and Gail's communication with the sales staff (or at least the substance of its contents) were material information under the agreement that should have been disclosed. We reverse the trial court's grant of summary judgment on the issue of whether or not the Crockers complied with their duty to disclose all material information.

### 2. *Aqua's Decision to Solicit Purchase Offers*

¶35. The Danielses claim that the Crockers failed to disclose the fact that Aqua's board had approved a valuation exercise eight days before C&A was sold. Dennis admits that he did not disclose the valuation but argues that it was not material information related to C&A's

value, especially since Aqua never sold. We find that the evidence in the record demonstrates a genuine issue of material fact both as to value and causation and as to C&A's demise.

¶36. Dennis knew that Aqua was accepting purchase offers as a means of valuation and gauging the possibility of a future sale. Answering when he first became aware of an "ownership transition plan," Dennis stated, "That was March 23rd, 2011, in the board meeting." This was eight days *before* the Crockers sold C&A to the Daniels. Dennis described the meeting: "There was a discussion about . . . go[ing] to five or six different companies . . . to ascertain what value [Aqua] might have and based on the valuations as to whether or not [Aqua] might be interested in selling." Aqua received board approval to proceed. The record does not indicate that any board member either abstained or voted against the decision. It is undisputed that Dennis considered his obligations to the Danielses:

> I did consider the position that it put me in, and I wondered what I could do about it, but I was in a fiduciary responsibility and a secrecy agreement with [Aqua] that I could not violate, and if I did so, it would be at the risk of even a lawsuit from them back at me.

Dennis stated that he did not consult a lawyer about his obligation to the Danielses. He did state, however, that he spoke with Robert Wimmer, Aqua's chief executive officer, about possibly informing the Danielses of Aqua's valuation. Recounting his conversation with Wimmer, Dennis stated,

> He told me I had a fiduciary responsibility to [Aqua] that superceded any other responsibility, that I was sworn to secrecy, and that if I divulged the information I had and that it ultimately damaged him with his rep force in the field, that I could expect legal action from him.

¶37. However, Wimmer did not remember the conversation that Dennis claimed to have

14

had with him. Also, Wimmer testified that he was not sure when he found out that Dennis was selling C&A and did not believe that he "knew anything about it" on March 23, 2011. Wimmer testified in his deposition that "in[] executive session . . . the shareholders and directors that were present [were told] that [Aqua] might entertain selling the business." He acknowledged that Dennis was present at the meeting. He also testified that Dennis "[f]rom that day on" was privy to the discussion about ownership transition decisions.

¶38.    We find a genuine issue of material fact exists as to whether the Crockers' failure to disclose Aqua's valuation caused or contributed to the demise of C&A and subsequently damaged the Danielses. In his affidavit, Marc claims that he would not have gone through with the transaction had he known about Aqua's marketing. He avers that news of Aqua's marketing destabilized C&A's sales representatives when they heard about it from a competitor. According to Marc, C&A's sales representatives were worried about whether Aqua would continue its contracts with C&A if it was bought by an investor with allegiances to other representative firms. Many of Marc's claims are disputed, but, as with all disputes of fact, that is a determination for the jury.

¶39.    A genuine issue of material fact also exists as to whether the failure to disclose Aqua's decision to solicit purchase offers was material. Throughout the record, the parties agree that Aqua represented fifty to seventy percent of C&A's annual revenue. Further, Cunningham testified that the actions of Aqua's board at the March 23 meeting "change[d] everything" and "change[d] the valuation substantially." Also, he testified that the decision to sell Aqua was a "material event." He found the decision to sell Aqua "extremely relevant" and could not "see how anyone [could] argue that it was not a material fact that [Aqua] had been put

15

up for sale." Also, Hefner testified that the decision of Aqua's board to market Aqua "would have been information that I would have needed to provide to the loan officer."

¶40.   Cunningham's report and testimony also demonstrated a genuine issue of material fact as to whether or not the Danielses suffered damages. Cunningham's report concluded that the Danielses paid $2,915,000 in excess of the estimated fair market value. Also, Cunningham's testimony reaffirmed Marc's claim that he would not have purchased C&A had he known Aqua's leadership was considering selling.

¶41.   We acknowledge that Dennis was in a difficult position within the bounds of corporate law, but it was of his own making. He willingly warranted that he had disclosed *all material information* related to C&A to the Danielses despite not disclosing the information subject to the duty of confidentiality to Aqua he had assumed eight days earlier.

¶42.   A director of a corporation owes duties to the corporation that he serves and, equitably, to its shareholders. Among these duties, a director owes a duty of care and a duty of loyalty. ***Derouen v. Murray***, 604 So. 2d 1086, 1092 (Miss. 1992); ***Omnibank of Mantee v. United S. Bank***, 607 So. 2d 76, 84, 90 (Miss. 1992). The duty of care is

> a duty to perform the officer's or director's functions in good faith, in a manner that he or she reasonably believe to be in the best interest of the corporation, and with the care that an ordinarily prudent person would reasonably be expected to exercise in a like position and under similar circumstances.

***Derouen***, 604 So. 2d at 1092.

¶43.   The duty of loyalty—the duty at issue here—"arises in that the officer or director stands in a fiduciary relationship to his corporation and shareholders." ***Id***. Fiduciaries must be "held to something stricter than the morals of the market place." ***Meinhard v. Salmon***,

16

164 N.E. 545, 546 (N.Y. 1928). Further, the duty of loyalty "imports proscriptions on conflicts of interest." *Derouen*, 604 So. 2d at 1092. One such proscription is the duty to maintain the confidentiality of corporate information. *See Brophy v. Cities Serv. Co.*, 70 A.2d 5, 7–8 (Del. Ch. 1949) ("A fiduciary is . . . not to use on his own account information confidentially given him by the beneficiary or acquired by him during the course . . . of the fiduciary relation or in violation of his duties as fiduciary . . . unless the information is a matter of general knowledge."); *Oberly v. Kirby*, 592 A.2d 445, 463 (Del. 1991) ("It is an act of disloyalty for a fiduciary to profit personally from the use of information secured in a confidential relationship.").

¶44. Thus, Dennis was correct that he had a fiduciary duty to Aqua not to disclose the impending sale. Dennis assumed this duty to Aqua on March 23, 2011, at the board meeting. Eight days *later*, on March 31, 2011, he signed the Agreement with the Danielses that included the warranty that *he had disclosed all material information* relating to C&A.

¶45. There is enough evidence in the record to create a genuine issue of material fact as to whether Dennis breached the Agreement by assuming a duty to Aqua and then warrantying to the Danielses that he had disclosed all material information to them. Dennis cannot use his duty to Aqua to shield himself from liability where he learned of material information due to his fiduciary relationship and eight days later warranted to a third party that he had disclosed all material information—despite withholding the confidential corporate information.

¶46. To be clear, the Danielses were not entitled—at any point—to Aqua's confidential corporate information, but Dennis cannot now avoid all liability where he voluntarily

17

assumed two conflicting duties.[5] Indeed, per the Agreement, his warranty to the Danielses served to induce the Danielses to purchase C&A. Dennis cannot mislead the Danielses, either affirmatively or through silence, and then attempt to avoid personal liability because of a pre-existing obligation to Aqua not to disclose certain information. As a fiduciary, Dennis was obligated to Aqua before he voluntarily assumed a conflicting duty of disclosure to the Danielses.

¶47. This is not to say, though, that Dennis assumed any fiduciary duties to the Danielses; we merely hold Dennis to his assumed contractual duty. Dennis's testimony was clear that he weighed the threat of legal action by Aqua against not disclosing the information to the Danielses. In essence, Dennis chose his lawsuit. To be clear, he had options. He could have simply not warranted that he had disclosed all material information to the Danielses or warranted that he had disclosed only to the extent permitted by his fiduciary duties to Aqua. However, this obviously would have raised red flags and potentially affected the deal. This possibility does not relieve Dennis of his legal responsibility.

¶48. Dennis assumed a contractual duty to the Danielses to disclose all material information relating to C&A to the Danielses. A genuine issue of material fact existed as to whether or not Aqua's decision to solicit purchase offers was material. Thus, the genuine issue of material fact precludes summary judgment here as well.

---

[5] It is well-known that "one cannot serve two masters." As the pioneering rock group AC/DC recognized, "He's double dealing with your best friend / That's when the tear drops start."

### 3.    *Dennis Crocker's Intent to Sell His Stock*

¶49.    The Danielses also claim that the Crockers failed to disclose Dennis's intent at the time of selling C&A to sell or redeem his stock in Aqua.  The Crockers point out that Dennis did not seek to redeem his stock until seven months after the sale of C&A.  Wimmer testified that the ownership transition decision, presented to Aqua's board on March 23, 2010, included the sale of at least some of Aqua's shares.  Further, Dennis testified, "Heretofore, we had always presumed the only way that we would ever get the value for our stock would be to die and our estate would get it."  He also testified that he had "really gotten anxious hoping that we would sell" Aqua because "[t]hat would represent quite a piece of money." It is undisputed that Dennis did raise the issue of Aqua redeeming his stock once he was informed in October 2011 that Aqua was not going to be sold; Aqua redeemed Dennis's stock in 2011.  Thus, a genuine issue as of material fact exists in the record as to whether Dennis planned to sell his stock  as part of the Aqua transaction or otherwise, before he sold C&A to the Daniels.

¶50.    Further, Marc's affidavit precludes summary judgment as to materiality.  In his affidavit, Marc stated that, at the October meeting, "The Crockers touted the longstanding relationship Dennis had (and continued to have) with Aqua as founder, director and shareholder."  According to Stephen, Dennis represented that Aqua would not cancel its contracts as long as Dennis held his stock in Aqua.  Stephen testified that Dennis, in response to a question as to whether or not Aqua would stop using C&A, said, "not as long as I own stock in it."  Regarding this representation, Cunningham testified that Dennis "implied . . . that there was no intention of selling the company."  In his affidavit, Marc alleged that he

19

would not have gone through with the purchase of C&A had the sale of Dennis's stock been discussed. Regarding the materiality of Dennis's failure to disclose to C&A his plans to sell or redeem his stock, Marc claimed that "no other principal cancelled [C&A]. It was limited to Aqua. And the only thing that had changed was that there was no longer a Crocker connection."

¶51. The Danielses assert that the Crockers' words to the Danielses after the sale of C&A provided further evidence of genuine issues of material fact as to whether or not Dennis's intent to sell his stock was material information under the Agreement. In a letter to Marc on January 26, 2012, after the sale of C&A, Dennis wrote:

> First, I have sold all of my stock in Aqua . . . . I no longer sit on the Board of directors . . . . *I am no longer an asset for you there.* The bond between [C&A] and [Aqua] no longer exists, I.e. [sic] *C&A is no longer a sacred cow.* So you want to make sure that you are in their good grace. . . . Without AQUA, YOU ARE DEAD !! Don't ever lose sight of that.

(Emphasis added.) The fact that Dennis had viewed himself at Aqua as an asset to the Danielses is some evidence of a genuine issue of material fact that should have precluded summary judgment.

¶52. Dennis must have had the intention to sell his stock before entering into the Agreement with the Danielses *before signing the Agreement on March 31, 2011,* for the Danielses to prevail on this issue. The evidence in the record demonstrates a genuine issue of material fact on this point. There is evidence that Dennis knew that the original transition plan included the sale of his own stock. Once the transition plan fell through, Dennis pursued redemption of his stock, and Aqua redeemed his stock. There is also evidence that he communicated to the Danielses that his stock ownership in Aqua was significant to

20

C&A's success.

## B.     Negligent and Fraudulent Misrepresentation[6]

¶53.    The elements of a negligent misrepresentation claim are:

> (1) a misrepresentation or omission of a fact; (2) that the representation or omission is material or significant; (3) that the person/entity charged with the negligence failed to exercise that degree of diligence and expertise the public is entitled to expect of such persons/entities; (4) that the plaintiff reasonably relied upon the misrepresentation or omission; and (5) that the plaintiff suffered damages as a direct and proximate result of such reasonable reliance.

*Saucier v. Peoples Bank of Biloxi*, 150 So. 3d 719, 731 (Miss. Ct. App. 2014) (quoting

*Hazlehurst Lumber Co. v. Miss. Forestry Comm'n*, 983 So. 2d 309, 313 (Miss. 2008)).

These "elements must be proven by a preponderance of the evidence." *Holland v. Peoples*

*Bank & Trust Co.*, 3 So. 3d 94, 101 (Miss. 2008).

¶54.    The elements of a fraudulent misrepresentation claim are:

> (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) his reliance on its truth, (8) his right to rely thereon, and (9) his consequent and proximate injury.

*Virginia Coll., LLC v. Blackmon*, 109 So. 3d 1050, 1054-55 (Miss. 2013) (quoting *Schmidt*

*v. Catholic Diocese of Biloxi*, 18 So. 3d 814, 831 (Miss. 2009)).  These elements "must be

proven by clear and convincing evidence." *Levens v. Campbell*, 733 So. 2d 753, 761 (Miss.

1999).

¶55.    We have long recognized the principle that a party is liable for its silence where its

---

[6] The facts relevant to this issue that were discussed under the Contract analysis, in (I)(A) above, are incorporated by reference into this analysis.

silence "relate[s] to material fact or matter known to the party and . . . it is [the party's] legal duty to communicate to the other contracting party." *Guastella v. Wardell*, 198 So. 2d 227, 230 (Miss. 1967). Further, "the duty to disclose is based upon a theory of fraud that recognizes that the failure of a party to a business transaction to speak may amount to suppression of a material fact which should have been disclosed and is, in effect, fraud." *Green Realty Mgmt. Corp. v. Mississippi Transp. Comm'n*, 4 So. 3d 347, 350 (Miss. 2009). Also, the Restatement (Second) of Torts provides that a "party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated . . . matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading." *Restatement (Second) of Torts* § 551(2)(b) (1977).

¶56.    The record contains no evidence that the alleged fraud by the Crockers was overt in nature. However, the record contains enough evidence to reverse the grant of summary judgment on the Danielses' fraudulent-misrepresentation claims due to the factual question of whether or not the Crockers' silence about material facts was fraudulent.

### 1.    2010 Drop in Bookings

¶57.    As set forth *supra*, a factual dispute exists as to whether or not the Crockers disclosed the previous history of C&A's bookings that would have allowed the Danielses to discover the drop in bookings in 2010 and whether the Crockers knew that 2010's low bookings would affect C&A's future.

¶58.    Sufficient evidence exists to establish a genuine issue as to whether or not the Crockers knew the drop in bookings would affect C&A's finances, whether they failed to

22

disclose their knowledge of the impact and whether this silence amounted to fraud.

¶59.    Under Mississippi law, silence concerning a material fact may amount to fraudulent suppression of that fact where the silent party knows that its silence will be relied on by the other party. *See Green*, 4 So. 3d at 350. Therefore, a genuine issue of material fact exists as to both negligent and fraudulent misrepresentation on this issue.

### 2. *Aqua's Decision to Solicit Purchase Offers and Dennis Crocker's Intent to Sell His Stock*

¶60.    Sufficient evidence is present in the record to create a genuine issue of material fact concerning whether or not the Crockers are liable for misrepresentation on the issues of Dennis's knowledge, the materiality of Aqua's decision to solicit purchase offers, and Dennis's intent to sell his stock. While the evidence on the issue does not indicate fraud of an overt nature, the record demonstrates enough evidence to create a question for a jury as to whether the Crockers' silence was, in fact, fraudulent. Dennis knew that Aqua had decided to solicit purchase offers when he signed the Agreement with the Danielses. There also is evidence that he knew any potential sale of Aqua would include his stock in Aqua. While Wimmer testified that the board of directors was "very surprised" by the proposal to sell Aqua, surprise is not enough to relieve Dennis and the Crockers of their legal duty to disclose once they knew of the proposed sale of Aqua and Dennis's stock in Aqua. The Crockers had a duty to disclose "matters . . . that [they] kn[ew] to be necessary to prevent [their] partial or ambiguous statement of the facts from being misleading." Therefore, a genuine issue of material fact exists as to both negligent and fraudulent misrepresentation on this issue.

23

### C. Punitive Damages

¶61.    In their amended complaint, the Danielses plead a claim for punitive damages. We find that the trial court erred in granting summary judgment on this claim. To prevail on a claim for punitive damages, "the plaintiff 'must prove that the breach was the result of an intentional wrong or that a defendant acted maliciously or with reckless disregard of the plaintiff's rights.'" *T.C.B. Constr. Co. v. W.C. Fore Trucking, Inc.*, 134 So. 3d 701, 704 (Miss. 2013) (quoting *Pursue Energy Corp. v. Abernathy*, 77 So. 3d 1094, 1101 (Miss. 2011)) ("An award of punitive damages is an extraordinary remedy, reserved for the most egregious cases, and designed to discourage similar misconduct."); *see also* Miss. Code Ann. § 11-1-65(1)(a) (Rev. 2014) (recognizing that punitive damages are proper only in cases of "actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or . . . actual fraud.").

¶62.    Section 11-1-65(1)(b) provides that "[i]n any action in which the claimant seeks an award of punitive damages, the trier of fact shall first determine whether compensatory damages are to be awarded and in what amount, before addressing any issues related to punitive damages." Miss. Code Ann. § 11-1-65 (1)(b) (Rev. 2014). As we are remanding several of the Danielses' claims to be tried, it is appropriate here to reverse the grant of summary judgment on punitive damages. The issue of punitive damages should be addressed by the trial judge in accordance with Section 11-1-65(1)(b) after it is determined whether or not the Danielses are entitled to an award for compensatory damages.

24

**II.     The trial court properly granted summary judgment on the Danielses' indemnity and rescission claims as well as Marc's and Sandra Daniels' claims, individually.**

¶63.    The trial court properly granted summary judgment to the Crockers on the Danielses' indemnity and rescission claims.  Further, Marc's and Sandra's claims, as individuals, fail as a matter of law.

**A.     Indemnity**

¶64.    The Danielses claim that they are entitled to indemnification by the Crockers pursuant to the Agreement.  As already discussed, we will apply South Carolina law to the issues governed by the Agreement.  *See* ***Miller***, 481 So. 2d at 262.

¶65.    "Contractual indemnity involves a transfer of risk for consideration, and the contract itself establishes the relationship between the parties."  ***Rock Hill Tel. Co. v. Globe Commc'ns, Inc.***, 611 S.E.2d 235, 237 (S.C. 2005).  The provision at issue states:

> (a)     Indemnification by the Seller. . . . The Seller and the Crockers, jointly and severally, shall indemnify, defend, and hold Buyer harmless from, and reimburse the Buyer for, any losses, fees, costs, expenses, damages, liabilities, or claims (including, without limitation reasonable attorneys' fees and costs) arising out of, based upon, or resulting from . . . misrepresentations or inaccuracy contained in any representation or warranty of the Seller in this Agreement. . . .
>
> (b)     Notice of Claims. *The Buyer shall promptly give written notice of its claim to the Seller* and the Crockers (collectively, the "Indemnifying Party") whenever the Buyer shall have determined that there are facts or circumstances which render the Indemnifying Party liable for indemnification under this Section . . . .  Such notice . . . shall set forth in reasonable detail the basis for the claim, the nature of the liabilities and the amount thereof, to the extent known.

(Emphasis added.)  In their amended complaint, the Danielses did not allege that they "promptly g[a]ve written notice" of their claim to the Crockers.  After a review of the record,

25

we are convinced that the Danielses did not comply with this condition in the Agreement. Thus, the trial court did not err in granting summary judgment on the Danielses' indemnity claims against the Crockers.

### B. Rescission

¶66. The Danielses also asked the trial court to rescind the sale of C&A. "Rescission of a contract is allowed in cases of fraud, mistake, or material breach." *Jackson Motor Speedway, Inc. v. Ford*, 914 So. 2d 779, 783 (Miss. Ct. App. 2005) (citing *Cenac v. Murry*, 609 So. 2d 1257, 1273 (Miss. 1992)). To prevail on a claim for rescission of a contract, a party must "pro[ve] . . . fraud by clear and convincing evidence." *Ezell v. Robbins*, 533 So. 2d 457, 461 (Miss. 1988). Further, "[u]pon discovery []of [the fraud], the one defrauded must act promptly and finally to repudiate the agreement." *Turner v. Wakefield*, 481 So. 2d 846, 849 (Miss. 1985) (citing *Stoner v. Marshall*, 358 P.2d 1021, 1022-23 (Colo. 1961)); *see also Gardner*, 755 So. 2d at 1276 (recognizing a party's duty, upon discovery of fraud, "to either promptly rescind the contract or affirm the contract and maintain an action in damages.").

¶67. The Danielses' claim for rescission fails as a matter of law. The Danielses did not "act promptly and finally to repudiate the agreement" when they discovered the actions that they believed were fraudulent. By January 26 2012, the Danielses knew about the 2010 drop in bookings, Aqua's decision to solicit purchase offers and Dennis's selling of his stock. However, the Danielses waited until October 2012 to attempt a rescission of the Agreement. While the delay does not affect their other claims, a claim of rescission requires "prompt" action. Therefore, the trial court did not err in granting summary judgment to the Crockers

26

on the Danielses' rescission claim because there was no genuine issue as to material fact as a matter of law.

### C.    Marc and Sandra Daniels's Claims, Individually

¶68.    Lastly, the trial court properly granted summary judgment on Marc and Sandra Daniels's claims as individuals. In Mississippi, "a corporation is a separate, distinct entity from its stockholders." ***Durham v. Univ. of Miss.***, 966 So. 2d 832, 835 (Miss. Ct. App. 2007). Further, "an individual shareholder of [a company] does not have standing to pursue [a] claim for damages from an alleged breach" of contract. ***Id***. These governing principles hold true in cases of fraud as well. *See **Schiff v. Mao, Inc.***, 31 So. 3d 650, 652 (Miss. Ct. App. 2010) ("[Plaintiff] was never a party to the agreement that forms the basis of his fraud claim."). Therefore, the trial court's grant of summary judgment was proper.

### CONCLUSION

¶69.    Because the record demonstrates genuine issues of material fact as to the Danielses' contract, negligent and fraudulent misrepresentation, and punitive damages claims, we reverse in part the grant of summary judgment. Since the trial court properly granted summary judgment on the Daniels's rescission and indemnity claims as well as Marc and Sandra Daniels's claims as individuals, we also affirm in part the grant of summary judgment. We remand this case to the trial court for further proceedings consistent with this opinion.

¶70.    **AFFIRMED IN PART; REVERSED IN PART AND REMANDED.**

**WALLER, C.J., RANDOLPH, P.J., KITCHENS, KING, COLEMAN, MAXWELL AND BEAM, JJ., CONCUR. DICKINSON, P.J., NOT PARTICIPATING.**